220 F.2d 593
 Joseph A. PHELAN, Complainant,
v.
MIDDLE STATES OIL CORPORATION et al., Defendants.
Meyer KRAUSHAAR and Sophie D. Cohen, as executors of William
W. Cohen, deceased, Sophie D. Cohen, individually,
and Levy Brothers, Appellants,
v.
Joseph GLASS and Joseph P. Tumulty, Jr., executor of Joseph
P. Tumulty, receivers, and Middle States Petroleum
Corporation, Appellees.
 No. 284, Docket 22426.
 United States Court of Appeals, Second Circuit.
 Submitted June 22, 1954.
Decided Jan. 11, 1955.
Rehearing Denied Feb. 21, 1955.
On Award of Costs March 25, 1955.
Writ of Certiorari Denied May 16, 1955.
 
 Meyer Kraushaar, New York City, for appellants.
 Leslie Kirsch, New York City, for Glass.
 Ralph Montgomery Arkush, New York City, for Middle States Petroleum Corp.
 Joseph P. Tumulty, Jr., Washington, D.C., pro se.
 Before L. HAND, SWAN and FRANK, Circuit Judges.
 L. HAND, Circuit Judge.
 
 
 1
 We dismissed an appeal from the judgment in this case because it was not final against Glass, and because, although it was so against Tumulty and the Middle States Petroleum Corporation, it would have resulted in great duplication of time and expense to go over the same issues twice. We suggested then that the parties might stipulate to delete those parts of the judgment that limited its finality as to Glass and to discharge him unconditionally.[1] This they did, but in two other opinions, on January 15 and February 8, 1954,[2] we concluded that such amendments must be approved by the district court under Fed.Rules Civ.Proc. rule 23(c), 28 U.S.C.A.; and we therefore remitted the cause to Judge Smith. On May 21, 1954, after hearing on notice to all parties he entered a judgment amending the judgment, from which, as amended, the original appellants have again appealed. The present judgment (disregarding the reversal of the dismissal of the counterclaim of the Middle States Petroleum Corporation against the executors of Cohen) now unconditionally declares (1) that Cohen's executors, and Levy Brothers and Sophie D. Cohen individually 'have failed to establish any right to surcharge against Joseph P. Tumulty and Joseph Glass, as Receivers of the United Oil Producers Corporation, or recovery against Middle States Petroleum Corporation in favor of the estate of United Oil Producers Corporation or any of those claiming through said estate'; (2) denies all motions to surcharge the receivers and approves their accounts; (3) discharges them as such receivers; (4) dismisses the 'general charges of fraud and conspiracy'; and (5) dismisses nine 'specific claims of fraud and conspiracy' which it describes severally in detail. The judgment leaves undisposed of all liabilities of Glass and Tumulty, as receivers of the Middle States Oil Corporation, or of any of its 35 and more subsidiaries. We need not decide many of the issues litigated at the trial, even though these related to the rights and liabilities of the United Oil Producers Corporation against, or to Middle States Oil Corporation, or any of its subsidiaries, save as decisions on these bear upon the value of the assets of United Oil Producers Corporation, sold in reorganization. Ordinarily, of course, it would be necessary to liquidate these claims as to both their validity and amount in order to appraise their value, and to decide whether the price at which they were sold to the Middle States Petroleum Corporation was 'fair.' However, as we shall show, it is not necessary to do this in the case at bar because the intercorporate claims were complicated far beyond any possible liquidation within in the time allowed by the district court for that purpose. The only question is whether the price fixed and obtained was the best attainable in the circumstances. If it was, that was all for which the appellants can now demand the receivers of the United Oil Producers Corporation to account. For these reasons we shall not discuss any claims of Cohen's executors, as shareholders of the Southern States Oil Corporation, or the claims of Sophie D. Cohen, individually, or of Levy Brothers, as such shareholders. These have no bearing upon the liability of Glass and Tumulty to the bondholders or creditors of United Oil Producers Corporation. Nor has the claim of Sophie D. Cohen, as a shareholder of the Oil Lease Development Company, any such bearing, because, even though we will assume for argument that she may have been entitled to prosecute the claims of that company, its only claim against the receivers of United Oil Producers Corporation, was as a pledgee of some of the bonds of that company, so that whatever disposes of the interest of Cohen's executors, as holders of such bonds, applies equally to the interest of Sophie D. Cohen, as shareholder of Oil Lease Development Company.
 
 
 2
 We shall use the following abbreviations: The 'Bondholders' will mean all those bondholders who did not deposit their bonds in reorganization; 'U.O.P.' will mean United Oil Producers Corporation; 'M.S.O.' will mean Middle States Oil Corporation; 'M.S.P.' will mean Middle States Petroleum Corporation; the 'Receivers' will mean Glass and Tumulty, as receivers of United Oil Producers Corporation. The appeal involves only three questions: (1) Whether the sale to 'M.S.P.' in reorganization of the assets of 'U.O.P.' was conducted as the law requires; (2) whether the plan of reorganization satisfied the Boyd Rule[3] by giving to bondholders an 'equitable equivalent' in 'M.S.P.' of their former claims against 'U.O.P.'; and (3) how far the 'Receivers' are liable personally if either answer to the forgoing questions is negative. The claim against 'M.S.P.' is that, as it was a party to the sale and to the consequent plan of reorganization, it was a grantee of a fraudulent conveyance. The charge against Glass rests more particularly upon the allegation that he actively promoted the reorganization fraudulently as part of a conspiracy to secure an interest for himself in 'M.S.P.'; and that, even if not a party to any such actual fraud or conspiracy, he had such personal interests in transferring the assets of 'U.O.P.' to 'M.S.P.' as conflicted with his duty as receiver, and threw upon him the burden of justifying his conduct, a burden which he did not carry. Furthermore, the 'Bondholders' charge that, even though Glass was not engaged in a conspiracy to defraud them, the 'Receivers' were derelict in their duty as such, in the conduct of the sale of the assets, and that the burden of proof lay upon them to show the extent of the loss incurred and their profits therefrom.
 
 
 3
 After a long and warmly contested trial, Judge Smith handed down a comprehensive opinion, accompanied by 272 findings of fact, in which he decided that the 'Bondholders' had failed to establish any liability against the 'Receivers' or 'M.S.P.'; but which dismissed the counterclaim of 'M.S.P.' against Cohen's executors. To the allegation that Glass and the committee that reorganized 'M.S.P.' united in a conspiracy to secure the assets of 'U.O.P.' in fraud of the 'Bondholders,' Judge Smith found that the 'general charges of fraud and conspiracy are not proved.' (124 F.Supp. 779.) Of Glass he said that 'he gave the impression, during his extended testimony, of sincerity and honesty of purpose. He was unconvincing on two subjects,-- the explanation of his erroneous testimony that his M.S.P. salary was not included in the overhead allocated to the corporations in receivership, and in his testimony as to the meaning of his statements on the Manning trial in Delaware. With these possible exceptions, he appeared through the long weeks on the stand, frank and honest in testimony and thoroughly convinced of the good faith of his every action in the receiverships. Moreover, many of the individual actions attacked by the objectants turned out to be convincing illustrations of Glass' good faith in dealing with his trust. The readjustment of inter-corporate claims after reorganization, in May, 1930, for instance, operated to the disadvantage rather than to the advantage of M.S.P. The appraisals and the eventual realization by M.S.P.'s subsidiaries from the sales in the ancillary jurisdictions are convincing proof of meticulous care that the sellers be treated fairly. So also with the comparative prices paid receivership estates and outsiders for similar securities purchased by M.S.P. Some of Glass' transactions may have been harmful to some of the receivership estates. If so, the Court is convinced that they were not the result of active fraud or attempts to despoil the receiverships for his own benefit or that of M.S.P.' Although it is of course true that such a finding is not exempt from review by us, 'it is not enough that we might give the facts another construction, resolve the ambiguities differently, and find a more sinister cast to actions which the District Court apparently deemed innocent.'[4] We have again and again laid especial weight upon the importance of findings that touch the good faith and honesty of a witness, whom the judge has seen; for, as we have said, on such occasions the printed record does not preserve a part of the evidence, which on that issue is often crucial. To ascertain anothers motives we are of necessity driven to inferences, for they are never manifest to our senses; no one can see, hear or feel what has actuated someone else. Among the sensible facts on which we must rely is the manner in which the witness utters his testimony: i.e., his address and bearing, his frankness, his directness and freedom from evasion, his assurance as to what he has personally observed, and his readiness to admit his uncertainty as to what he has not: all these things are among the most convincing means of deciding whether to believe his testimony. And so, when a judge of tried experience has had the opportunity to observe a person through days of the most searching and provocative cross-examination; and when he has made findings and written an opinion that show the most painstaking and impartial solicitude to reach the truth, his decision about that person's motives is nearly conclusive; and we should disturb it only when the objective circumstances make it clear that the unpreserved evidence could not have properly overbalanced the inherent improbability and inconsistency of his spoken words. We can find nothing in this record that would sustain such a conclusion as to Glass. The 'Bondholders" brief abounds in charges that gravely impugn his honesty, and impute to him a ruthless disregard of his duty to the creditors of 'U.O.P.,' or of the other subsidiaries. Were they true, nothing could excuse him; but, so far as we have discovered, there are none that furnish any affirmative proof against him. It is quite true that, once one assumes that he was bent upon forcing all to join the reorganization, what he did was consistent with that purpose, but that is altogether irrelevant, if it was equally consistent with innocence, as it was.
 
 
 4
 It would take too long to go over in detail all that is mustered against him; but one or two illustrations may deserve notice. The brief repeatedly asserts that Glass had planned to become president of the new company a good while before the sale of the 'U.O.P.' assets in 1929; and that his letters covertly betray this wish. On the contrary, the letters bear every evidence of an unwillingness to be president, though they quite frankly declare that he would like to be the lawyer for the reorganized corporation. Take for example this passage from a letter written in October, 1927, to one, Gilbert, a banker in Oklahoma: 'I have personally reached the definite decision that I do not care to continue with the reorganized company in any executive capacity, as I do not feel that I would want to subordinate my professional practice to the daily necessities of a going business, and I feel that if I were to attempt it, the company's interests would suffer. The only relationship on my part with the company in the future that will be possible, as far as I am concerned, will be a professional relationship, if my legal services should at any time be required.' Conceivably such language might have been used to disarm opposition while Glass was in fact intriguing to get the job; but on what imaginable ground can it be taken as affirmative evidence that he was doing so? To take it as written in fulfillment of such a clandestine purpose is completely to pervert its natural meaning.
 
 
 5
 Again, take the agreement that the 'Receivers' got from the reorganization committee in the following terms: 'It is the understanding of counsel for the Reorganization Committee that the acts of any persons who are employees of the Receivers and are permitted by them to participate in such action of the Boards' (i.e. 'resolutions authorizing the filing of answers admitting the allegations of the bills of complaint') 'shall not be deemed the action of the Receivers or action taken on their behalf; and that the action of the respective Boards * * * shall in all respects be without prejudice to the right of the Receivers to raise any question with respect to the subject matter of said suits or any of them in the event that the Reorganization Plan as now existing or hereafter amended shall fall through.' Of this the 'Bondholders' say in their brief that it 'of course * * * meant that these judgments and decrees, though absolute on their face, were subject to be vacated at the instance of the Receiver if the plan was not carried out. It is difficult to see, therefore, in view of all the circumstances, how this sale was not collusion or 'hocus-pocus." As we understand this argument, it means that the 'Reorganization Plan' would have 'fallen through,' if an outsider had appeared at the sale and outbid the reorganization committee; and that in that event the 'Receivers' had the option of vacating the decrees on which the sale was made. In the first place the 'Plan' would not have 'fallen through,' if that had happened, for it was a condition precedent of the 'Plan' itself that they should be offered to outsiders, and that, if a bidder appeared, who should outbid the reorganization committee, the properties should pass to him. The 'Plan' would not in that event have gone into effect, but the properties would have passed beyond the power of the court, exactly as it was intended they should. The 'Plan' would not miscarry, if the prescribed alternative to it had been realized. In the second place even if we impose that meaning on the words, 'fallen through,' the agreement did not give the 'Receivers' the power to 'vacate' the 'judgments and decrees.' All it did was to provide that the 'Receivers' should be free to take such action as seemed to them to be for the best interest of the defendant corporations, regardless of the fact that the 'action of the Boards' in consenting to any 'judgments and decrees,' might have required the votes of employees of the 'Receivers.' It was plainly no more than a precaution-- probably unnecessary-- to retain whatever power they had had to provide for any occasion that might arise after a breakdown. How it can be thought to have been any evidence of conspiracy to seize the properties we cannot understand.
 
 
 6
 Finally, although we are prepared to make large allowances for the heat of advocacy in a litigation that has engendered so much feeling, we cannot pass without mention that part of the 'Bondholders" brief that imputes to Judge Smith a partiality in favor of the 'Receivers.' For example: 'The Trial Judge treated the Receivers with the utmost tenderness, resolving every question of fact, every adverse inference in favor of the Receivers and granting them a clean bill of health, where as the objectants and their counsel were subjected to express and implied unwarranted criticism.' It is curious to find this charge supported by the amendment to the 79th Finding of Fact, from which at the 'Bondholders" demand the judge deleted the adjectives 'reckless' and 'careless' that he had originally used to characterize their conduct, and which, as it now stands, criticizes equally that of both parties. Again: 'Yet we are compelled to submit most earnestly that he apparently had a blind spot when it came to judging the Receivers' conduct, particularly Glass'.' It is indeed always proper for an appellant to show that the trial judge was guilty of partiality, or of any other judicial impropriety relevant to his decision, and, indeed, nothing can more justly move an appellate court to reverse; but it is a charge that gravely miscarries when it is not made good; and it would be difficult to imagine less support for it than in the case at bar, where the record throughout shows a patience and will to do even-handed justice, that might serve as a model for imitation anywhere.
 
 
 7
 However, although we put aside, as we do, the charge that Glass was a party to any fraud or conspiracy, we agree with the 'Bondholders' that the burden would nevertheless be upon him to prove that they had suffered no actionable loss by any of his acts or decisions in which he could have been actuated by a personal interest that conflicted with his duty to them. Moreover, in that event it would not relieve him of the burden even to prove, if he could, that his putative interest did not in fact influence him, for the law will not attempt to weigh how far such an interest may have played a part in the result, once it be shown to have existed. What we said on the first appeal we repeat with equal emphasis. Nevertheless, before the burden of proof shifts, the beneficiary must prove that there was such a conflict; it therefore rested on the 'Bondholders' to prove that Glass had some personal interest in putting through the reorganization that conflicted with his duty as receiver. In considering that question we must at the outset distinguish between an occasion where the conflicting interest is personal to the fiduciary, and one where it arises between two or more of his beneficiaries. For example, in the case at bar the 'Bondholders' repeatedly complain that Glass failed to pay the interest on the 'U.O.P.' bonds at times when that company was in adequate funds to do so. This, they argue, was because he preferred the interest of 'M.S.O.' which at the time he thought had more pressing need for the money. To a similar charge Judge Smith made what we regard as the proper answer; it might be true, he said, that 'in some instances such as failure earlier to realize on the collateral behind the Chatham-Phenix note he' (Glass) 'was unconsciously influenced by a desire to benefit the group of receiverships as a whole and later M.S.P., rather than to act solely for the benefit of the estate of Western. That was a danger incurred by the Court in order to avoid the expense of some thirty-eight additional receiverships. If it did occur and cause damage to the estate of Western, some means must be found to rectify it.' (124 F.Supp. 779.) But he did not include among those means a surcharge of Glass on the theory that he was a fiduciary subject to a conflict of interests. Similarly, assuming for argument that there were moneys of 'U.O.P.' that Glass might have used to pay the interest on its bonds, his interest, as receiver of 'M.S.O.,' which owned directly or indirectly substantially all of 'U.O.P.'s' shares, even if it conflicted with that of the 'U.O.P.' bondholders, was a conflict inevitable in the set-up of 38 or 39 receiverships all conducted as one. Glass owed the same duty to 'M.S.O.' as to 'U.O.P.'; both duties had been imposed upon him by the court, and he was not only free, but bound-- if they conflicted-- to decide which need was the more imperative. It must be remembered that the 'U.O.P.' bondholders had no legal interest in the income as yet; as mortgagor, that company was free to use its income until the mortgagee, the indenture trustee, moved to sequester it for the bonds.
 
 
 8
 Nor was it necessary for the 'Receivers' to procure an order of the court whenever a conflict of interest arose between any of the 38 corporations with custody of whose assets they had been entrusted. The interests of all were so enmeshed that countless transactions were likely to involve 'U.O.P.' with 'M.S.O.,' or with one of its subsidiaries, that the court would have been obliged constantly to intervene in the administration of the suits. That was exactly what Judge Knox meant to avoid, because as Judge Smith found: 'During the receiverships * * * temporary loans were made by the receivers * * * from one receivership estate to another. This was done without Court order in reliance upon the order of appointment requiring the properties and business of all the companies to be administered as an entirety.' Moreover, even if it had been a fault not to get an order, the 'Bondholders' have not shown that Judge Knox would not have granted leave to use the money, so that no loss was shown; and they had the burden of proving that they were damaged, so long as the 'Receivers' had no personal interest in the decision.
 
 
 9
 However, there were other occasions when the 'Bondholders' assert that Glass had a personal interest that conflicted with his duty, which if they were right, would have shifted the burden of proof. The first of these is as follows. Glass had been a member of the firm that had represented Shivers, the plaintiff in a shareholders' suit against 'M.O.S.' commenced in 1924. All that was ever done in that suit was to move for a receiver, which was denied; and almost at once Phelan, a creditor of 'M.S.O.,' filed the suit against 'M.S.O.,' followed by the others of which the action at bar is one. The services of the firm in this shareholders' suit could hardly have had any but a trifling value; but in any event they stand or fall with the services in the creditors' suits themselves. All these were of the type common thirty years ago before the amendments to the Bankruptcy Act, 11 U.S.C.A. § 1 et seq., or the passage of the S.E.C. legislation. They were a variant of the long existent judgment creditors' bill in equity, and were designed to effect an equal distribution of a corporate debtor's property among its creditors. They usually alleged that if this was abandoned to a scramble of attachments and executions, the creditors generally would be losers; and the jurisdiction in equity rested upon this circumstance. Since originally such a bill lay only after judgment and was to reach assets not subject to execution, it was necessary before judgment for the debtor to consent to the appointment of a receiver. In the case at bar after the 'Receivers' were appointed, the debtor's creditors in all 38 suits formed committees, and Glass's firm represented them in all, so long as Judge Mayer remained in office. After his death Glass was substituted in his place, and his firm at once ceased to represent any of the committees. The 'Bondholders" argument is that, since the firm's allowance, as counsel for these committees, had not been fixed before the sale of 'U.O.P.' assets in December, 1929, and since he therefore retained an interest in what should be allowed, he had a personal interest that was in conflict with his duty as receiver. Moreover, the firm had agreed with the succeeding counsel that its allowance should be a proportion of the allowance made to their successors so that Glass became directly interested, not only in what should be allowed for his firm's services rendered before he became receiver, but for those rendered thereafter; and a successful reorganization would be likely greatly to enhance his allowance. A complete answer to this is that not only Glass, but Jackson, a member of the succeeding firm, swore that this agreement was made in 1930, after the sale of the 'U.O.P.' assets, and after 'M.S.P.' had undertaken to pay all expenses of the receivership. We can find no testimony to the contrary and Judge Smith's general acceptance of Glass's credibility serves in place of a finding. It was still true that all through his receivership and up to the sale, Glass's allowance remained undetermined, but we cannot see that that created an interest with which a sale as opposed to a reorganization would conflict. The argument must be that Glass's firm, as attorneys for the creditors' committees, performed services during the first year of the receivership, the allowance for which would in some measure depend upon whether five years later a reorganization went through. That appears to us too remote and speculative a conflict to fall within the doctrine invoked by the 'Bondholders.' We shall deal more at large with the general question in a moment when we come to Glass's hope to be counsel for 'M.S.P.'
 
 
 10
 The second supposed conflict between Glass's duty and his personal interest was this. His firm had retained one, Hamburg, to take charge of extensive tax claims against 'M.S.O.,' of course including 'U.O.P.' It was part of the agreement that Hamburg should assign a proportion of his allowance to the firm, in place of paying rent for the use of their offices. We cannot see that the amount of Hamburg's allowance would have been larger if 'M.S.O.' was reorganized, rather than if the properties were sold to an outsider. The allowance was an expense of administration and had to be paid in either event. Had it been liquidated before the sale, Glass would indeed have had an interest in not opposing it, but it was not. Moreover, even then the conflict would have tainted, so to say, only the allowance granted Hamburg.
 
 
 11
 The third alleged conflict is that Glass had a covert understanding that he was to be president of 'M.S.P.' when formed; and, in default of that, that he hoped and expected to be its counsel. We have already indicated that Judge Smith's findings as to the future presidency of 'M.S.P.' are, not only not 'clearly erroneous,' but that the attack upon them is without any support whatever in the evidence and is indeed positively contradicted by contemporaneous correspondence. It is not necessary to do more in disposing of this charge than to quote the findings themselves. 'A month and a half after the organization of the new company, and after ascertaining that the Court had no objection' (to) 'Glass' serving as president of the new company, on an understanding with the company that, in any case in which the company's interest conflicted with his position as receiver, he would act as receiver and not for the company, Glass accepted election as president of the new company. He had not actively sought election to the position, having made known his desire to terminate his management responsibilities although he hoped to continue to be associated in a legal capacity with the new corporation. Search on the part of the members of the reorganization committee for an experienced oil man to head up the new company was, however, unsuccessful and by the offer of a salary of $50,000 a year, with the right to continue his law practice, Glass was induced to continue as the executive head of the reorganized company.' (124 F.Supp. 734.)
 
 
 12
 The fourth and last supposed conflict was that Glass hoped and with good reason expected to be chosen counsel for 'M.S.P.' when it was reorganized; and that he had no such expectation if the Eureka shares were knocked down to an outsider. True, it did not follow that such a putative outsider might not have wanted him as counsel, but that we disregard as too remote. Moreover, we agree that although he had no contract with the reorganization committee, he had good reason for thinking that 'M.S.P.' when organized would follow the obvious preference of the committee and offer the job to him. Was that such a conflict as invokes the doctrine? It enables the beneficiary to hold the fiduciary liable for any profits he may make, or losses he may cause, in order to deprive him of any inducement that will affect his absolute and disinterested loyalty; and there is no doubt that an expectation or hope of future advantage may do so, even though it is not secured to him as an existing legally protected interest. Therefore, if the doctrine be inexorably applied and without regard to the particular circumstances of the situation, every transaction will be condemned once it be shown that the fiduciary had such a hope or expectation, however unlikely to be realized it may be, and however trifling an inducement it will be, if it is realized. We do not understand that it is to be applied so rigidly, or to so literal an extreme. The Restatement of Trusts[5] states it in these words: the 'trustee violates his duty to the beneficiary not only where he purchases trust property for himself individually, but also where he has a personal interest in the purchase of such a substantial nature that it might affect his judgment in making the sale.' And this has been incorporated in ipsissimis verbis into Scott on Trusts.[6] That statement we accept, and the question at bar is whether Glass's expectation of being counsel was an interest so 'substantial * * * that it might affect' his promoting as much as he should have done, the sale of the Eureka shares in place of including them in the reorganization of 'M.S.O.' It is true we cannot know that the chance of employment could not have had any influence upon his conduct; and it is of course true that, if the 'Bondholders' had shown that in fact it did have any, he would not only have to disgorge any profits he had got, but to prove that what he did was an impeccable discharge of his full duty, or to make good any loss that it caused. But we are not dealing with such an occasion; we have to determine the scope of the implementary rule that dispenses with the need of proving that his personal interest had any part in determining the fiduciary's conduct; indeed, with a rule that altogether forbids any inquiry whether it had any such part. We have found no decisions that have applied this rule inflexibly to every occasion in which the fiduciary has been shown to have had a personal interest that might in fact have conflicted with his loyalty. On the contrary in a number of situations courts have held that the rule does not apply, not only when the putative interest, though in itself strong enough to be an inducement, was too remote, but also when, though not too remote, it was too feeble an inducement to be a determining motive.
 
 
 13
 In Bullivant v. First National Bank, 246 Mass. 324, 334, 141 N.E. 41, 45, shareholders of a company who had deposited their shares in trust with a bank sought to enjoin it from voting the shares for a proposed reorganization of the company, because the bank, as a creditor, had a conflicting interest that disqualified it from voting. The court held otherwise, saying that the 'facts reported by the master did not disclose any proposed violation of this rule': i.e. that a 'trustee cannot become purchaser of property title to which he holds in his capacity as trustee.' In Anderson v. Bean, 272 Mass. 432, 446, 172 N.E. 647, 654, 72 A.L.R. 959, the trustee held all but three of the 6000 shares of a corporation-- half, as trustee, half, individually. He sold 100 shares of those that he held as trustee: 25 to his son, 25 to each of the sons of a deceased brother, and 25 to the superintendent of the factory. The beneficiaries sought to charge the trustee with the value of the 100 shares above their sale price on the ground that by their sale he had gained a personal advantage: i.e. control of the corporation. The court disallowed the surcharge, saying that the 'disturbance of the equal balance of holdings of stock by the trust and by the trustee as an individual is not as matter of law, apart from other circumstances, unconscionable advantage or disadvantage.' It agreed that a trustee 'cannot derive any personal advantage at the expense of the estate, nor put himself in a position antagonistic to the beneficiaries of the trust'; but that that doctrine 'simply is not applicable to the facts here disclosed.' Yet, surely voting control 'might' very easily 'affect' a fiduciary's 'judgment,' if we are dealing in all possibilities, however remote. In In re Harton's Estate, 331 Pa.St. 507, 515, 516, 1 A.2d 292, 296, a trustee invested part of the fund in a participation in a mortgage; and at the same time 'undertook the task of acting as rental agent for the mortgagor and received from him a commission of five per cent on rentals so collected.' As to this the court said: 'The compensation received by the trustee as rental agent for the owner was not money which the participating trust interests would otherwise be entitled to. They would have belonged to the owner, or would have been paid out to some other rental agent as fair compensation for services rendered. It was not shown that the rental commissions were in any sense a profit; on the contrary, they were just charges for services performed by accountant in its required administration of the trust, and their receipt does not offend the admitted rule against a trustee's obtaining a bonus or commission from dealings with specific trust property, as commented upon in American Law Institute, Restatement of Trusts, §§ 170 and 203, pp. 438 and 549.' Pike v. Camden Trust Co., 128 N.J.Eq. 414, 422-424, 16 A.2d 634, involved substantially the same situation and the decision was the same; indeed, it relied upon the passage from In re Harton's Estate that we have just quoted. In Dabney v. Chase National Bank, 2 Cir., we said:[7] 'It is not every possibility, however remote, of a conflict of interest between a trustee and his beneficiary which will forbid his entering into a transaction with a third person. * * * there must come a point at which he is not bound to take against himself a future chain of events, each link of which carries a substantial coefficient of improbability. * * * The law ought not make trusteeship so hazardous that responsible individuals and corporations will shy away from it. As we said in York v. Guaranty Trust Co., 2 Cir., 143 F.2d 503, 514: 'Of course, the courts should not impose impractical obligations on a trustee. Merely vague or remote possible selfish advantages to a trustee are not sufficient to prove such an adverse interest as to bring his conduct into question."
 
 
 14
 The trustee's advantage in Dabney v. Chase National Bank, supra,[7] was security for a loan, and the increase in its value was indeed very 'substantial'; but our decision rested on the unlikelihood that the increase would ever be realized. In the two Massachusetts cases the advantage was immediate and certain, but the court thought it too insignificant in value to count; and in the other two decisions the advantage was employment by the purchaser, just as it was here; and, indeed, the trustee had actually been engaged and thus had a legal right to the job. Moreover, as in the case at bar, the advantage was obtainable only by means of a quid pro quo-- services to be rendered-- which of course diminished its inducement. Finally, we should remember that, although Glass was indeed reasonably sure to be retained, nevertheless he had no contract and his employment depended upon what the administration of 'M.S.P.' might decide. It appears to us most undesirable upon all possible occasions to forbid a purchaser of property from a fiduciary to continue him in its management, upon the assumption that the prospect of getting the job may taint the purity of his decision to sell. Again and again it must be in the interest of the purchaser to keep him; and that possibility may contribute to give the property a greater value than it otherwise would have. Taking the situation in the case at bar as a whole, we do not believe that the prospect of a retainer by 'M.S.P.' was a 'personal interest * * * of such a substantial nature' as was likely enough to cause Glass to fail in his duty to promote the sale of the Eureka shares, and to throw the burden of proof upon him; and we conclude, not only that the 'Receivers' were not parties to any fraud or conspiracy against the 'Bondholders,' as Judge Smith found; but also that the 'Bondholders' had the burden of proving that they had lost through some dereliction of Glass in his duty to them as receiver of 'U.O.P.' It was of course open to them to prove that the 'Receivers' did default in the discharge of their duty, and what they did lose; but in a situation so extravagantly complicated and so impervious to analysis as the welter of legal rights and obligations left by Haskell and his fellows, the party that has the burden of proof is nearly sure to lose.
 
 
 15
 The 'Bondholders' do allege that they showed affirmatively that the 'Receivers' did fail to discharge their full duty, and that they have shown what was their loss and at least Glass's profit. This they claim to have proved as to Glass in two respects: (1) that he was party to fixing the minimum prices of the 'U.O.P.' assets too low; and (2) that he not only failed to give adequate publicity to the sale, but that he actually 'chilled' the bids. We repeat what we said upon the first appeal, that a receiver 'is 'bound to act fairly and openly with respect to every aspect of the proceedings before the court. * * * The court, as well as all the interested parties,' have 'the right to expect that all its officers,' including the receiver, will not 'fail to reveal any pertinent information or use their official position for their own profit or to further the interests of themselves or any associates.'[8] A receiver has the 'affirmative duty to endeavor to realize the largest possible amount' for the assets of the estate.[9] If he has vital information which, if disclosed, might bring a better price for property * * * he must fully disclose it 'prior to the sale when the prospects (are) greater for successful bargaining."[10] It is with these principles in mind that we will consider what the record discloses as to both the faults charged against Glass. First, as to the minimum prices that the reorganization committee-- with the consent of Glass-- fixed for the sale of the 'U.O.P.' assets. These consisted (1) of all the shares in the Eureka company, which held 82.44% of the shares of the Turman Company, which in turn had three extremely profitable leases in the Oklahoma oil fields; (2) of a guaranty by the Imperial Oil Corporation, and (3) of the intercorporate claims of 'U.O.P.' against 'M.S.O.' and a number of its subsidiaries, which, though not pledged to the bondholders, as were the Eureka shares, were nevertheless security for any deficiency under the mortgage because the bondholders were substantially the only creditors of 'U.O.P.' The price fixed by the committee for the Eureka shares was $1,450,000, and Judge Smith found that it was 'fair.' The 'Bondholders' challenge this finding, and the question is whether his finding is 'clearly erroneous.' In appraising the shares the judge adopted four possible approaches; of which, however, we need concern ourselves with only two, for he found that 'of the various balance sheets in evidence, those entitled to most weight in determining value are those based on capitalized earnings and contemporaneous market values of stock.' There was no evidence of quotations of actual sales of Turman shares during 1929; only of the bid and asked quotations, and it is quite true that these are not very reliable sources for 'contemporaneous market values of stock.' (124 F.Supp. 764.) Indeed, in New York apparently they are treated as wholly incompetent.[11] However, under Federal Rule 43(a) evidence, incompetent under the law of the state where the trial is had, may yet be received in a federal court; and we do not see why actual asked prices in accepted publications should be utterly incompetent as evidence at least of maximum values, in absence of evidence impeaching their good faith. True, bid and asked prices give us nothing but the extremes between which sales, if any, will take place, but it seems to us that the asked prices may be taken as some evidence that the value was no higher. The asked price for Turman shares, from April 10 to October 10, 1929, was between $4 and $8; and between October 10, 1929 and April 10, 1930, it was between $4 and $6. No doubt any attempted appraisal can be only approximate; but we cannot say that $4 was a 'clearly erroneous' approximation, in face of the fact that throughout this year nobody appears to have been willing to offer more than $5 for the shares.
 
 
 16
 Be that as it may, in several decisions[12] the Supreme Court has treated as a particularly reliable method of appraising the value of corporate shares (we assume this to presuppose the absence of actual sales upon an open market) the capitalization of the 'reasonably to be anticipated earnings' of the corporation; and we have read these cases as laying it down 'that the best test of the value of a going commercial enterprise is its earning capacity.'[13] What is the proper coefficient to apply to the earnings the Court naturally has never made any attempt to declare; obviously it must vary with the nature of the business, and in the case of a wasting asset, like an oil well, it will be much higher than in an ordinary industry, because the earnings then include part of the capital. The earnings of the Turman company for the five years preceding 1930 had varied greatly owing to the fact that in 1927 some new wells went into large production. The net income for the three years 1927, 1928 and 1929 (disregarding for the moment any 'non-recurrent' disbursements) was about $1,057,000, or an average of $352,000. On the other hand the years 1925 and 1926 had shown a net loss of about $64,000, so that if the whole five years are considered together, the average becomes what Judge Smith found it to be: $198,519.57. Moreover, the average income for the five years from 1929 to 1934 inclusive was $81,403.38. However, since the five years that followed 1929 were those of the Great Depression, the 'Bondholders' with some warrant protest against their inclusion, for, although all values began to melt in October of 1929, no one in December 'reasonably anticipated' the extent of the collapse that followed. On the other hand, it would be unfair to take the three productive years 1927-1929 inclusive as a proper measure of the future, for no one could know how long the new wells would last; and indeed, the income for the year 1928 was already only a little more than 75% of that for 1927, and that for 1929 was still less. The year 1925 resulted in a loss of over $111,000; and, if it be thought unfair to include it, certainly it would be permissible to take the four years 1926-1929 inclusive: which gives an average of about $276,000. At a coefficient of 10 this would of course make the value of the Turman shares $2,760,000 of which 82.44% owned by Eureka would be $2,275,000, of which $1,450,000 is less than 64%. On the other hand the average coefficient of appraisal in the case of nine oil corporations comparable with Turman was 19.31, and that, even though it were applied to the average earnings for 1926-1929 inclusive, gives a value of less than $1,430,000, of which 82.44% is only a little more than $1,100,000. Indeed, if the lowest coefficient of six of the nine companies-- 15-- be taken, the value of the Eureka proportion is only about $1,500,000. Plainly therefore $1,450,000 was not a 'clearly erroneous' figure to set as a 'fair' price under this hypothesis.
 
 
 17
 The 'Bondholders' complain of the omission from the computation of the average annual income of the Turman company of what they call the 'non-recurrent' items appearing upon one of their exhibits-- No. 170. Some of the items deducted appear to be such that they would have had, at least in part, some equivalents if the Eureka company had not been in receivership; from the face of the exhibit it is impossible to say that under another name they might not have been a usual corporate expense. However, suppose we accept them all as they stand, as 'non-recurrent,' and take an average of income for five years, and, for a coefficient, the average, 19.31. At the average for five years-- $374,000-- this would make the Turman shares worth substantially $1,800,000, of which 82.44% is $1,484,000. And even though we count only the four years, 1926-1929 inclusive, so that the average income was $414,500, the value of the Turman shares was less than $2,150,000, of which 82.44% is $1,775,000, of which in turn $1,450,000 is more than 80%. Certainly, 20% of the price that a seller would take at an unforced sale is not an unreasonable discount for a price at a forced sale at auction. Thus, even though we take the 'non-recurrent' items at their face, the minimum price for the shares was 'fair'; certainly it would be beyond any possible propriety to hold that a finding that it was 'fair' was 'clearly erroneous.' On the whole our guess is that it bordered on the high side.
 
 
 18
 The only other assets of 'U.O.P.' were the guaranty of the Imperial Oil Company and its claims against 'M.S.O.' and the other corporations in the Haskell System. We shall include these together in our discussion, for the same considerations govern the disposition of each. Two orders were entered, one, on December 14, 1929, and the other, in May, 1930, professing to liquidate the intercorporate claims of the various enmeshed companies. The 'Bondholders' protest that these orders are not conclusive; and, although we do not find it necessary to hold whether they were, we will assume for argument that they were not. They were nevertheless bona fide efforts to learn what were the mutual credits and debits; and we accept them as some evidence of what the claims were; certainly they are the best available. We need consider only the three largest claims of 'U.O.P.': that against 'M.S.O.' for nearly $1,400,000; that against Reliable Securities Corporation for about $2,000,000; and that against Imperial Oil Corporation for about $2,250,000-- a total of over $5,500,000. The first question is whether it was proper to sell these claims without some authoritative settlement of their validity and amount. In the ordinary case it might indeed be true that it was not proper, for obviously, until then bidders could not know what they would get if their bids were accepted. However, this was as far as possible from being the ordinary case. The receiverships had been going on for five years, during which the 'Receivers' had been making continuous efforts to find out what were the mutual rights and liabilities of the maze of corporate entities. Judge Smith found that 'the books of the companies were either non-existent or inaccurate. Advances had been made between the companies, proceeds from the sale of stock recorded as income from oil sales, and other irregularities existed.' As early as November, 1924, an accounting firm employed by an engineering firm, which in turn the 'Receivers' retained, had reported that the part of their work 'by far the most difficult of accomplishment' was to 'develop a history of transactions affecting capital stock and bond issues, the acquisition of properties and securities, and establishing the considerations paid, as well as real intrinsic values thereof; ascertain dividends declared and paid, determine present ownership of leaseholds and if possible ascertain the earnings and expenses since incorporation in 1917.' To this the accountants prophetically added that 'the possibility looms up that all the real facts will never be entirely disclosed.' In June of 1925 the 'Receivers' reported to Judge Knox that the books, records and accounts of the Middle States Oil Corporation and its subsidiaries prior to the 1st of January, 1924, were so incomplete, complicated and confused that it was impossible readily to ascertain approximately the financial condition of the companies or their true financial relation to one another.' It is quite true that in May, 1928, nearly three years later, they reported that 'inventories of all physical equipment * * * have been completed' and that 'valuation engineers are now at work completing their appraisals of all of the leaseholds' which 'will be used as the basis for proper book entries as of January 1, 1928.' It was their purpose 'to thereafter present recommendations to the Court for the disposition, without litigation, of these intercorporate accounts upon notice to all interested parties.' They felt it their duty, they said, to have the companies come out 'with their affairs in order. To bring such a condition about, from the lack of record and the chaos as to existing record which the receivers found * * * has been a mammoth task.' 'Fortunately the end is in sight. The complications which remain are few in number. The facts with respect to them have been clarified.' Nevertheless, they added that the 'solution depends in large part upon the common sense attitude of the parties involved, in working out adjustments as between themselves. If they fail to apply common sense, then they will have themselves only to thank for any delay in the resumption of the business affairs of these companies.' It turned out that the hopes of the 'Receivers' that the parties would adopt 'common sense attitudes' were not realized, and Judge Knox had already become very restive at the continued delay, for beginning in March, 1928, he several times expressed his 'grave concern' at the accumulating cost; and on March 3, 1929, he summoned the 'Receivers' and the committee to appear before him on the 9th and discuss 'various features of the case.' There followed a number of hearings at all of which Judge Knox pressed both the 'Receivers' and the committee to prepare a plan of reorganization that might put an end to the extreme waste that kept on. Judge Smith found that the 'Court pressed for action looking toward reorganization and termination of the receiverships, insisting in early 1929 that positive action be taken.' He also found that 'delay in reorganization would have run the costs up so that the chance of any organization surviving would have disappeared.' (124 F.Supp. 736.)
 
 
 19
 It is against this background that the action of the committee with Glass's concurrence is to be judged. We do not mean to intimate that Judge Knox was wrong in insisting that the Gordian knot must be cut at any cost; but we do mean that, right or wrong, as to Glass at any rate his decision was imperative; for it would be patently absurd to hold a receiver liable for complying with an order that was within the jurisdiction of the court that appointed him. Therefore, whatever were the consequences of selling the claims before they were liquidated, and however necessary liquidation ordinarily may be, Glass's liability is to be judged by whether he did the best he could within the limited time granted him. Nor can we find any evidence that he concealed from Judge Knox anything that bore upon the situation. His reports, after he became receiver, were very full, and he was in constant communication with the judge. The chief basis of the charge of concealment is that he did not tell Judge Knox of his conflicting personal interests, and as we have seen, there were none such. Incidentally, Glass gave evidence of a proper sensitiveness upon the score of divided loyalty after he accepted the presidency of 'M.S.P.,' though still a receiver. True, there was an inevitable conflict of interest between the corporations whose claims were being appraised, for any reduction in the credit of one was a release of debit to another; but, just as in the case of failing to pay interest upon the 'U.O.P.' bonds, these were conflicts that the very nature of his duties required him to decide; and they can be charged to him as a fault only by a misconception of the meaning of the doctrine invoked.
 
 
 20
 We must therefore accept it as an inescapable condition that some value had to be set upon the claims of 'U.O.P.' against 'M.S.O.' and its subsidiaries within a period that did not allow any authoritative liquidation. We cannot see what more either the committee or Glass could do than to make the best approximation that was available; all that was open to them was a 'solution' that depended 'in large part upon the common sense attitude of the parties involved in working out adjustment as between themselves.' In short, they were bound to do the best they could within the time they had even though the result were no better than a guess. There is not the slightest evidence that this is not exactly what they did; although the claims due to 'U.O.P.' on their face were for the very large amounts we have mentioned, they appraised them at only $300,015, of which they took $200,010 as a fair minimum price. This appraisal depended upon the labyrinth of cross claims between the corporations making up the 'M.S.O.' system; and we do not know how they were reached, nor is it necessary that we should; they stand unless they are shown to have been incorrect and they have not been. Moreover, even were we to match our judgment against that of Judge Smith, it would be the height of presumption for us to say that his approval was 'clearly erroneous.'
 
 
 21
 In one respect it is true that his finding does open a question for our review. A price was apparently first fixed at what was called the value of an asset for 'reorganization purposes,' meaning its value to a going concern, and the minimum price was fixed at two thirds of that amount. In the case of the Eureka shares the question does not arise whether this was too large a discount because, as we have shown, there was ample evidence justifying at worst an appraisal of which the minimum price was 80%-- a discount too obviously proper to need any defence. In the case of the guaranty and the intercorporate claims, although there is indeed no such objective test, the nature of the property was such as to make a large discount inevitable. In order to judge the propriety of the appraisal for 'reorganization purposes,' let us first assume that 'U.O.P.' wished to dispose of all the intercorporate claims, being free to keep them, if it did not get a satisfactory price; but, nevertheless, desiring to do so without authoritative liquidation. Such was the occasion on which $300,015 was set as a fair price for the claims, which, as we have said, it was not 'clearly erroneous' for Judge Smith to accept as 'fair.' Let us then contrast this with the 'fair' price at a forced sale at auction. 'In business life forced sales for cash are such a last resort for obtaining money that a sale 'under the hammer' is synonymous with a sale at a sacrifice, and prices obtained at such sales have usually been rejected by courts when tendered as evidence of value.'[14] How then can we say what was a 'fair' price when the seller was forced to sell at auction and without any opportunity to bargain? The truth is that any decision inevitably is a speculation, where no more may be demanded than an honest effort to decide questions of validity that have no available answer, and to measure values that are not measurable. That does not indeed mean that a figure could not have been put that was plainly wrong; but any guess that we might substitute would have as little likelihood of being right as the honest guess of those who were very much better informed. The discount of one third, used as to assets of this kind, was within permissible latitudes.
 
 
 22
 Therefore we conclude that both as to the Eureka shares and as to the guaranty and intercorporate claims Judge Smith's findings that the minimum prices set were 'fair' should not be reversed; and there remains only the question whether Glass was delinquent in his duties, as receiver, upon the sale. As we have already said, we can find nothing to warrant the charge that he concealed from Judge Knox any information that he had about the affairs of the company; so that this phase of the dispute depends upon (1) whether the sales of the U.O.P. assets were conducted in accordance with the decrees; and (2) whether the 'Receivers' failed to discharge any additional duties to secure the attendance of bidders impliedly imposed on them as receivers. The Eureka shares were sold apart from the 'unpledged' assets under the decree of November 15, 1929, entered in a suit brought by the Chatham-Phenix Bank, as mortgagee, to foreclose the mortgage upon them and to enforce the guaranty of the Imperial Oil Company. The 'unpledged' assets-- i.e. the intercorporate accounts-- were sold under the decree of November 22, 1929, in one of the creditors' suits brought by Phelan. The foreclosure decree directed the special master to publish a notice of the sale in certain specific newspapers, but the notice itself gave no information about the shares. The decree in the Phelan suit directed the sale of all the 'unpledged' assets of U.O.P. as one out of four separate 'parcels,' and later a sale of this 'parcel' together with the three others; the master was to accept the aggregate bid, or the sum of the four bids, whichever was higher. Article Sixth of this decree required the special master to 'file with the Clerk of the Court a statement showing and describing as definitely as practicable and made up to the latest day reasonably practicable, but in general terms,' the following information: (1) all the assets of the 'Holding Companies': i.e. 'M.S.O.' 'U.O.P., Imperial Oil Corporation and Oil Lease Development Company; (2) all liens and charges by pledge or deposit created by these four companies; (3) all tax claims against them, state or federal; (4) all unpaid liabilities including any executory contracts assumed, or executed, by the 'Receivers'; and (5) all executory contracts made by the companies themselves and still outstanding. The receivers filed such a 'statement' in four parts: one for 'M.S.O.;' one for Imperial Oil Company; one for 'U.O.P.'; and one for Oil Lease Development Company. That for 'U.O.P.' stated the cash on hand and the Eureka shares, both as being held as security for the bonds; next it stated certain claims, 'amounts undetermined,' against the Haskell interests; next, it mentioned 'miscellaneous accounts receivable securities and assets believed to be worthless and uncollectible'; next, it mentioned 'claims against various subsidiary and affiliated companies for post receivership advances'; next, the three 'intercompany claims against subsidiary and affiliated companies' aggregating about $4,500,000; next it set forth the mortgage securing the bonds; next, an 'undetermined tax liability, if any'; and finally, it concluded by mentioning all the open allowances 'to be fixed by order of the Court,' ('undetermined tax liability if any'-- a repeat-- ); 'current office salaries and expenses,' 'claims by various subsidiary affiliated companies for post receivership advances'; no executory contracts of any kind. All the four statements contained the following addendum: 'Further information with respect to the foregoing may be obtained upon request at the offices of the Receivers, Room 1401, 170 Broadway, New York, N.Y.' In their offices the receivers did have compete records of all the accounts and the results of their work for the five years that they had been in office; and, so far as appears, these would have been accessible to anyone who showed a genuine interest in bidding at the sale.
 
 
 23
 Judge Smith found that this statement 'was wholly inadequate to inform bidders as to the assets to be sold, the receivers' liabilities to be assumed by the bidders, and the status of the government tax claims, and receivers' claims for tax refunds.' On the other hand, he also found that the 'plan of reorganization available since June, 1929, had made it plain that all or almost all the tax claims were expected to be defeated and refunds of substantial amounts obtained.' (124 F.Supp. 765.) True, the statement itself was positively 'misleading in that it listed large government tax claims without reference to the favorable progress of the tax litigation'; but it was 'unlikely that any prospective bidder would stop at the perusal of the statement without further inquiry of the receivers.' In general the 'complexities of the inter-corporate relationships, and of bringing down to date the valuations of physical assets and adjusting them to their book listing for the intervening periods were so great that no prospective bidder could have obtained sufficient information to judge independently without assistance from someone in the receivers' organization the value of the assets sold within the period from the filing of the statement to the sales.' It would have been wholly impossible within the time allowed to make anything approaching an adequate disclosure of the whole web of claims and cross-claims that a group of utterly unscrupulous stock jobbers had woven before 1924, and that had been continued as a single business by order of the court. Moreover, even if it had been possible, no reasonable bidder would have relied upon it without verification from the documents in the receivers' offices. All that Article Sixth required was that the statements should declare enough to advise all who might be interested as to what was the general character of the property, claims and liabilities that were to be disposed of, in enough detail to send them to the original sources, if they had any serious purpose to buy. Indeed, the article itself required no more than a statement 'in general terms.' Not only was it impossible to prepare more, but more would have been useless, if it had been prepared. The complaint that all the papers were not filed in the clerk's office is too trivial to justify an answer. It may be true, as Judge Smith said, that as to the tax liability the statement was, not only inadequate but actually misleading, for taken by itself as it read, it gave no intimation, not only that any liability was unlikely, but that there would probably be a large refund. It does not appear how much of the whole tax controversy affected the interest of 'U.O.P.,' with which we are alone concerned here; but we will not rest upon that, because we agree with the disposition made of it by Judge Smith: 'it is inconceivable * * * that anyone seriously interested in bidding would not have made further inquiry of the receivers.'
 
 
 24
 Since the foreclosure decree required no more than the notice in fact published, the sales were in conformity with its directions, and the question as to the sale of Eureka shares is whether the 'Receivers' should either have seen to it that the decree contained more specific publicity, or should, independently of the decree, have done more to procure the attendance of bidders, both as to the shares and the 'unpledged' assets. We understand Judge Smith to mean that they did fail to perform their duty, when he said that 'no intensive effort was made by the receivers to find outside bidders.' This understanding of his meaning is confirmed by the following additional passage: 'unless therefore the receivers are to be required to make good an amount in excess of what could have been obtained on foreclosure and receivership sales had they completely fulfilled their duty of disclosure, and active seeking of prospective bidders, there is here no amount to be surcharged for their failure to fulfill that duty.' (124 F.Supp. 788, 790.) We agree that a receiver is ordinarily under such a duty, but it is one to be measured by the particular occasion; and the scope of any duty is a question of law, not of fact, which we are free to determine as res nova. Coming then to the measure of the duty to seek out bidders, we note that on September 25, 1928, June 1, 1929, and November 13, 1929, Glass did establish contact with corporations, American or Canadian, which might have been interested in merging with 'M.S.O.'; and it does not appear that there were any other opportunities for disposal of the assets in whole or in part. The 'Bondholders' reason as though the sale had been of a piece of real property, the contents of a house, a retail business, or a completely integrated mercantile or industrial plant. That would be a completely delusive analogy; no casual bidder was conceivable for such property, either of the 'Second Parcel'-- the 'U.O.P.' assets alone-- or all four 'Parcels' together. The only possible bidder for all four 'Parcels' would have been some group or combination, already familiar with the oil business in Oklahoma; and it is extremely unlikely that such a group would not have known that for over five years 'M.S.O.' had been in receivership. Moreover, they would have expected that the receivership would end in some sort of reorganization as a condition of which the assets would almost surely be offered for open sale at auction. It appears to us unreasonable to suppose that any such group would have needed notice of such a sale, involving as it did taking over the whole vast snarl of inter-related corporate transactions during seven years and more of stock juggling. So far as anyone could reasonably anticipate, there would be no market for such an aggregation of rights and liabilities; but, if there was any, the bidders did not need to be alerted. There was even less reason to suspect the existence of any bidders for the 'U.O.P.' 'unpledged' assets sold under the decree in the creditors' suit, for the major part of these was the intercorporate accounts, whose purchaser would have merely bought into an incredibly complicated nest of law suits. Therefore, except as to the Eureka shares sold in foreclosure it seems to us that the 'Receivers' cannot be said to have failed in their duty. As to this property the answer is certainly not plain. True, they were not the kind of property that would be picked up by a random purchaser looking for bargains. Nothing is more uncertain than the life of an oil well; and those who buy them would presumably be already familiar with the business and likely to be aware of new developments. The Seminole fields on which the value of the Turman, and of the Eureka, shares depended had been in rich production for three years, and it seems to us unlikely that any persons who would have been interested in acquiring them would not have learned who controlled them, and that they were to be sold.
 
 
 25
 If we thought it necessary to decide the question, we might, however, agree with what we understand to have been Judge Smith's conclusion, although it is not a finding of fact, that the 'Receivers' did not do their full duty as to the Eureka shares. On the other hand, since the 'Bondholders' had the burden of proof to show that this default, if it was a default, resulted in loss to them, and since they have not shown that there were any bidders for the shares, it is not necessary to decide whether there was a default. As Judge Smith said, there was 'no evidence, except the receiver's own testimony, as to whether such outside bidders, if found and fully informed, would have made bids in excess of the reorganization committees' bids'; and he accepted Glass's testimony that the value 'placed on the mongrel assets' (by which we understand the 'unpledged' assets), 'for reorganization purposes, was considerably higher than any outside interests could safely, or would, with any degree of probability, have bid.' Again in the same vein, he said: 'Unless, therefore, the receivers are to be required to make good an amount in excess of what could have been obtained on foreclosure and receivership sales had they completely fulfilled their duty of disclosure, and active seeking of prospective bidders, there is here no amount to be surcharged for their failure to fulfill that duty.' (124 F.Supp. 788, 790.) It is true that the 'Bondholders' deny that the burden rested upon them to show that some loss resulted from the 'Receivers" fault; they maintain that, as soon as a beneficiary proves that his fiduciary has failed in the discharge of any of his duties, he must clear himself by proving that it caused no loss. However they refer us to no decisions so holding; and of course the ordinary rule as to tortfeasors is the opposite. Moreover, the practice in equity was always to require the beneficiary to prove any 'surcharges,' which he wished to impose upon a fiduciary; and so far as we have found, no distinction has ever been made between proof of the default and proof that some loss arose from it.[15] We are to distinguish the well settled doctrine that, when the sufferer from a tort proves that it has caused him some loss, he is not bound to prove its precise amount.[16] If the 'Bondholders' had proved that, if the 'Receivers' had searched for bidders further than they did, they would have secured one who would have outbid the reorganization committee, we will assume that that would have been enough; the 'Bondholders' would not have been bound to prove by how much such a bid would not have paid the bonds; but they proved the existence of no such bidder. As res integra, we can see no reason to extend the implementary rule to occasions, where although the fiduciary has been shown to be in default, the beneficiary has failed to show that it has caused him any loss. It is one thing to do that when the default involves disloyalty to the beneficiary, for that is a violation of the trust that lies at the very root of the relation, a relation that by its nature gives the fiduciary power to act for the beneficiary without his concurrence. But although the fiduciary engages to act in the sole interest of the beneficiary, he does not insure that he will always keep within the limits of his duties. He may misunderstand them; he may be forgetful; he may even be negligent; but he has not been truant to the good faith that he promised to devote to his undertaking. We see no reason why a lapse that does not involve such a breach should throw upon him the duty of disproving a loss that may not have happened at all, and bestow on the beneficiary a windfall to which he may not be entitled if the whole facts could be proved. In such a posture of the proof we can see no reason for not following the usual procedure.y persons who would have been interested in acquiring them would not have learned who controlled them, and that they were to be sold.
 
 
 26
 There remains the question whether Glass is liable under the Boyd Rule.[17] The argument is that the reorganization was illegal because the new securities to be issued against the new assets of 'M.S.P.' were not equal in tenor and priority to the bonds of 'U.O.P.' that the 'Bondholders' were to surrender in exchange. The Plan proposed an exchange of the 'U.O.P.' bonds (secured as they were, principal and interest, by the Eureka shares) for 'M.S.P.' bonds for whose principal and interest all the property of 'M.S.P.' was liable. Since that property included all the property of 'U.O.P.,' and also all that of the three other 'Parcels,' and since no added secured bonds were to be issued by 'M.S.P.,' there could have been no complaint if the new bonds had been the same in tenor and priority as the old. This was however not true: the maturity of the new bonds was accelerated, the future interest was reduced from eight to six and one half per cent, and the accrued interest, amounting to nearly a million dollars, was refunded into a preferred stock-- 'Class A'-- an issue shared with two creditors of 'M.S.O.': i.e. the 'Series Notes' and the 'Gulf Coast Claim.' In deciding how far this violated the rule, we must of course consider its authoritative statement. At the outset the Court introduced a caveat in these words: 'This conclusion does not as claimed, require the impossible, and make it necessary to pay an unsecured creditor in cash as a condition of stockholders retaining an interest in the reorganized company. His interest can be preserved by the issuance, on equitable terms, of income bonds or preferred stock';[18] and in Kansas City Terminal Ry. Co. v. Central Union Trust Co., 271 U.S. 445, 456, 46 S.Ct. 549, 552, 70 L.Ed. 1028, the Court rephrased this as follows: 'whenever assessments are demanded, they must be adjusted with the purpose of according to the creditor his full right of priority against the corporate assets, so far as possible in the existing circumstances.' Upon this variant in Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 122, 60 S.Ct. 1, 10, 84 L.Ed. 110, the Court appended the following gloss: 'where the debtor is insolvent, the stockholder's participation must be based on a contribution in money or in money's worth, reasonably equivalent in view of all the circumstances to the participation of the stockholder'; the final statement of the doctrine is in Group of Institutional Investors v. Chicago, Milwaukee, St. P. & P.R. Co., 318 U.S. 523, 565, 63 S.Ct. 727, 749, 87 L.Ed. 959, and reads thus: 'It is sufficient that each security holder in the order of his priority receives from that which is available for the satisfaction of his claim the equitable equivalent of the rights surrendered. That requires a comparison of the new securities allotted to him with the old securities which he exchanges to determine whether the new are the equitable equivalent of the old. But that determination cannot be made by the use of any mathematical formula.' This was reaffirmed in Otis & Co. v. Securities & Exchange Commission, 323 U.S. 624, 639, 640, 65 S.Ct. 483, 89 L.Ed. 511.
 
 
 27
 Applied to the case at bar, the relevant inquiry is therefore whether the addition to the property of 'U.O.P.' of the assets of the three other 'Parcels' made the 'M.S.P.' bonds when issued 'an equitable equivalent' of the old bonds. In other words whether the added security so given to the principal of the old bonds was a fair substitute for reducing the future interest, accelerating the due date and refunding the past interest into A shares. Judge Smith found that it was, for he said that the 'bondholders received * * * the substantial equivalent of the debt owing to them, both principal and interest,' and if this is a finding of fact, certainly it would not be 'clearly erroneous.' Assuming for argument that it is not such a finding, we must weigh the value of the old securities against that of the new, which it is impossible to do without a better appraisal than is possible of the assets contributed by the other 'Parcels': i.e. without a liquidation of the intercorporate claims. Thus, as to this question also the answer turns upon who had the burden of proof to show that the conveyance was fraudulent; and there is no reason to impose it upon Glass. To the argument that he was responsible for putting through the reorganization before these facts could be ascertained, we answer, as we did before, that the fault, if it was a fault, was not his, for his orders were peremptory. Considering the means of appraisal accessible to the committee within the time allowed them, there was adequate evidence to support Judge Smith's conclusion, for the exchanges provided in the Plan were the result of an honest attempt to take into account the numerous factors that controlled values and, so far as appears, the values assumed were as near the truth as was possible in the circumstances.
 
 
 28
 It is true, as Judge Smith observed in his opinion, that the Plan was apparently unfair to the creditors of 'M.S.O.' other than the 'Series Notes' and the 'Gulf Coast claim,' in that they received only shares of B stock in 'M.S.P.,' part of which was distributed also to the shareholders of 'M.S.O.' However, he was plainly right in refusing to allow the 'Bondholders' vicariously to assert the wrongs of the other creditors. We do not forget that on the first appeal[19] we said that 'the surcharging is not limited to an amount measured by the interest of the particular person thus objecting to the receiver's accounting, since the surcharge is for the benefit of all similarly situated persons. For the court, in administering the estate in its custody for all the beneficiaries, must see to it that none of them suffers because of the misconduct of its receiver, and the discharge of that obligation should not depend upon their appearance in court to voice their objections to that misconduct. Cf. Moon v. Wineman, 57 Minn. 415, 59 N.W. 494, 495. Thus, if the judge learned of the misconduct from a wholly neutral source (cf. Investment Registry v. Chicago & M. Electric R. Co., supra, 212 F. (594), at page 608), he should surcharge the receiver and distribute among all interested the money owing to the estate by the receiver because of that misconduct.' This was a note in support of the conclusion that the 'Bondholders' should not be barred because of Cohen's possible laches; it did not suggest that Glass could be held liable in this suit to creditors of 'M.S.O.,' or of any other corporation. The question is not whether the conveyance, i.e. the reorganization, should be set aside (nobody asks that); it is whether Glass should be held liable because it is not set aside. His liability in the case at bar is as receiver of 'U.O.P.,' and it is irrelevant that he was also receiver of other corporations in other suits. Any recovery in this suit would of course include all the bondholders of 'U.O.P.'; but, even though we assume, arguendo, that unsecured creditors of 'U.O.P.' would also be included, that would not serve the creditors of other corporations. Judge Smith's ruling is in entire consonance with the note we have just quoted and we accept it.
 
 
 29
 The 'Bondholders' further object that the option given them to exchange their bonds for the new ones was foreclosed on May 14, 1930. The original date had been five times extended, covering an aggregate extension of four and a half months. During that period, so far as appears, no bondholder asked for any extension, or suggested that he did not have the information necessary to make a choice; nevertheless, the complaint is that the option should have been held open until the dividend in distribution was determined. We answer that, as one extension after another was granted, it should have been evident that there was likely to be a limit, and that such bondholders, if there were any, as were delaying their choice until the distribution dividend was fixed, should have communicated with the committee or the 'Receivers,' and are in no position to complain that their silence was taken as assent. But we go further. Judge Knox had decided that the receivership, already six years old, must be ended; and if 'M.S.P.' was to have a start unhampered by the past, it was essential that it should know how many of the old bonds would be refunded and how many it must pay off in cash. That could not be known until the options had expired; and not till then could Judge Knox's decision be put into effect.
 
 
 30
 Finally, we should not reverse the judgment on this record, even if the 'Bondholders' had proved that the transfer violated the Boyd Rule, and that Glass had made himself a party to the conveyance by his share in preparing it and in recommending its adoption to the chairman of the reorganization committee. That a third party may make himself liable to the creditors of the grantor of a fraudulent conveyance is true;[20] and apparently the original distinction-- which we followed in Duell v. Brewer, 2 Cir., 92 F.2d 59-- that the complaining creditors must have a lien is no longer law; and in any event in the case at bar the 'Bondholders' were lienors. Mr. Glenn says that a third person cannot be 'charged under the statute of fraudulent conveyances because the sole aim of that law is to nullify the grantee's title. The meddling outsider becomes liable under principles that are easy to understand, but they do not flow directly from the Statute of Elizabeth or any modern substitute.'[21] In the case at bar, even though Glass was one of those who took part in bringing about the conveyance of the property of 'U.O.P.,' and though he therefore did fulfil one of the conditions of liability, he would not be liable unless he had known that the securities of 'M.S.P.' which were offered for the 'U.O.P.' bonds were not an 'equitable equivalent'; or unless he had been informed of facts from which a reasonable person would have supposed that they were not 'equitable equivalent.' Suppose the new bonds were not in fact such an equivalent for the old; certainly there is nothing in the record to show that Glass thought so, or that from what he knew a reasonable person would have thought so. On the contrary, the only evidence is that he and the reorganization committee, which was more familiar with the facts than anyone else except perhaps Glass himself, thought that the exchange was of equivalents. Similarly, there was no evidence that 'U.O.P.' itself had that 'intent to defraud' which is a condition of any fraudulent conveyance under the Statute of Elizabeth, except in cases where no fair consideration whatever passes to the grantor,[22] which was not the situation in the case at bar. 'U.O.P.' was at the time of the transfer in the custody of the court, whose special master, as directed by the decree, executed the conveyance of the Eureka shares and of the guaranty and intercorporate claims. The only persons whose intent could have been relevant to this conveyance were the reorganization committee itself and Glass, and the same considerations that we have just mentioned touching Glass apply equally to the committee. The judgment in favor of Glass will be affirmed, and a fortiori that against Tumulty.
 
 
 31
 It is not necessary to discuss at length the 'Bondholders" claim against 'M.S.P.' which was brought into the suit after they filed their motion in 1944 to compel the receivers to account. This claim is against 'M.S.P.' as grantee of 'U.O.P.,' on the theory that the sale was a fraudulent conveyance; and if there was no fraudulent intent there could be no recovery against even the grantee. Hence the same considerations that dispose of the claim against Glass personally on the merits dispose of that against 'M.S.P.' However, we cannot agree with the conclusion below that the 'Bondholders" claim is not barred by the New York Statute of Limitations under the doctrine of Guaranty Trust Co. of New York v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079. The jurisdiction of the District Court depended solely upon diversity of citizenship, and the substantive rights and liabilities probably depended upon the law of the place where the transfer was made; at any rate they depended upon the law of some state and not upon federal law. Although, as has appeared, the actual deed was made by a special master of the court under its direction, the 'Bondholders' may not take the position that the transfer was illegal under federal law, for the court confirmed it and they did not appeal. They must argue that its validity depended upon the same state law that determines such a conveyance between individuals, and that the situation is as if 'U.O.P.' had made the conveyance in the course of a reorganization out of court, in which event the Statute of Limitations of New York would apply. Nor is it material that the final decree in the main action enjoined all creditors from bringing any action against 'M.S.P.' That did not toll the prosecution of its claims by the 'Bondholders'; all it did was to compel them to assert their claims in the District Court. Again, it is not material that Glass and Tumulty, as receivers of the other corporations, had not been discharged. As we said at the outset, the 'Bondholders' had no interest in the guaranty or the intercorporate claims after their sale to 'M.S.P.' Even if these had been sold at too low a price, they passed to 'M.S.P.' whose title to them would not thereafter be affected by anything done in this action. Hence the defence of the statute would be a bar, even if the claim had been proved.
 
 
 32
 In what we have just said, we do not forget what we said on the first appeal regarding the claim against the 'Receivers'; nor do we wish in any way to throw doubt upon it. This was what we did say, so far as it is relevant here. 'But we think that, with respect to the obligations of a receiver appointed by a federal court, the New York rule should not control. A claim against a derelict receiver is not against an ordinary trustee but against a court's officer. Who has the right to assert such a claim is a question affecting the integrity of the court itself. The federal courts, in holding their own officers to accountability, should not be hampered by state court decisions relating to ordinary trustees. When the United States issues a check, rights in that check (despite Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188) 'are governed by federal rather than local law.' Clearfield Trust Co. v. United States, 318 U.S. 363, 366, 367, 63 S.Ct. 573, 575, 87 L.Ed. 838. When a federal receiver incurs obligations through misconduct, the title thereto is, we think, similarly to be determined by 'federal law." (154 F.2d 1000.) Had the action been against the special master who conveyed the property to 'M.S.P.,' this language would have applied, just as it would have applied to Glass and Tumulty, had they 'misconducted' themselves. But the 'Bondholders' had no more claim against the special master than they had against Judge Knox of whom he was the instrument; and, to repeat, it is only on the theory that Judge Knox's order did not validate the conveyance, but left it as it would have been if the conveyance had been out of court, that any claim can exist. Hence, the state law must govern, including its Statute of Limitations. The judgment dismissing the claim against 'M.S.P.' must also be affirmed.
 
 
 33
 Judgment affirmed.
 
 
 34
 FRANK, Circuit Judge, dissenting (as to the liability of Glass).
 
 
 35
 My colleagues concede that if Glass, as receiver of UOP, violated his duty of undivided loyalty to any of the bondholders of that company, then he had the burden of proof as to most of the matters now before us, and that then many of Judge Smith's findings, favorable to Glass, do not stand up but are 'clearly erroneous.' My colleagues also concede, in effect, that whichever side in this litigation had that burden must lose the decision. I dissent primarily[1] because I think that Glass was not (as my colleagues say he was) 'entirely innocent' and that he did violate that duty, in that he had undisclosed interests, adverse to the UOP bondholders, which might well have tended to influence him to further the interests of claimants junior in rank to those bondholders, with respect to the assets of UOP.
 
 
 36
 The court, in its decree of November 15, 1929, directing the foreclosure sale of the Eureka stock, found that there was due to the UOP bondholders, $4,500,000 (approximately), representing principal of about $2,500,000 and interest of about $2,000,000.[2] So that UOP then owed each holder of a $1,000 UOP bond about $1,833. Each holder of such a bond, not deposited under the plan, received on July 25, 1933, as a result of those sales, $698.55 in cash, or about 39% of the amount due on November 15, 1929 (but without interest, on the amount thus paid, from that date to July 25, 1933). For reasons I shall state, I think Glass had the burden of proving that this recovery was not most inadequate and unfair.
 
 1. Applicable Principles
 
 37
 As this case relates to the conduct of a receiver appointed by a federal court, and thus affects the integrity of the federal judicial process, I shall discuss that conduct in some detail. The discussion divides into two major categories: (a) The unfairness of the prices paid at the judicial sales for the UOP assets. (b) The unfairness of the reorganization plan.
 
 
 38
 It will be helpful, by way of prelude to such a discussion, to repeat these general principles stated in our former opinion, 154 F.2d 978, at pages 991-992, and with which my colleagues now express agreement: 'A receiver, as 'an officer or arm of the court,' is a trustee with the highest kind of fiduciary obligations. He owes a duty of strict impartiality, of 'undivided loyalty,' to all persons interested in the receivership estate, and must not 'dilute' that loyalty. He is 'bound to act fairly and openly with respect to every aspect of the proceedings before the court. * * * The court, as well as all the interested parties,' have the 'right to expect that all its officers,' including the receiver, will not 'fail to reveal any pertinent information or use their official position for their own profit or to further the interests of themselves or any associates.'[3] A receiver has the 'affirmative duty to endeavor to realize the largest possible amount' for assets of the estate.[4] If he has vital information which, if disclosed, might bring a better price for property * * * sold pursuant to court order, he must fully disclose it 'prior to the sale when the prospects (are) greater for successful bargaining.'[5] Since failure to make such full disclosure has 'a tendency to dampen the sale,'[6] it is presumed that it did so, where the receiver had an interest in the sale in conflict with that of any other parties to the proceeding, 'regardless of whether it actually had an adverse effect or not,' because 'the incidence of a particular conflict of interest can seldom be measured with any degree of certainty.'[7] A decree confirming such a sale does not exculpate the receiver.[8] When the receiver has brought about such a sale, and the property after the sale has been transferred to a company in which interests of innocent third persons have become vested, usually the sale will not be set aside if there is available the more practicable method of surcharging the receiver for the difference between the price paid and the value of the property.[9] Where a receiver has a possible personal interest adverse to those of any parties to the receivership, it is usually unwise for him to participate in the reorganization; if he does so he must act with unusual caution * * *. A receiver who has strayed from his duty to the injury of anyone interested in the estate can and should be surcharged when he asks approval of his final accounting.[10] The rule that a receiver must not be motivated by personal considerations is prophylactic; its sanction is a surcharge.'[11] See also Restatement of Agency, Secs. 387, 389 and Comments c and e, Sec. 390 and Comments a and f; Mechem, Agency (2d ed. 1914) Secs. 1188 et seq.; the recent case of Mosser v. Darrow, 341 U.S. 267, 71 S.Ct. 680, 95 L.Ed. 927;[12] and the ancient authority, Matthew VI, 24: 'No man can serve two masters: for either he will hate the one, and love the other; or else he will hold to the one, and despise the other.'
 
 
 39
 2. My colleagues' tacit, but untenable, key assumption, i.e., that a 'system' reorganization was essential, and that a separate reorganization of UOP was impractical and not for the best interests of the UOP bondholders.
 
 
 40
 Indispensable to all my colleagues' conclusions, and therefore to their decision, and to Judge Smith's, is an assumption which neither they nor he ever discuss but which they take for granted. I mean their tacit assumption that it was impractical to reorganize UOP separately-- apart from the reorganization of the other companies in the MSO holding company 'system'-- and that the UOP creditors (namely the UOP bondholders) were not disadvantaged seriously by a unified or 'system' reorganization, i.e., one involving the creation of a single new company owning or controlling all the assets of UOP as well as the assets of most of the other companies in receivership. If (as I think) that assumption is untenable, then the perspective becomes basically different. For then it appears that Glass had substantial personal interests (a) which would be realized through the consummation of the 'system' reorganization that he furthered but (b) which would not be realized if UOP were separately reorganized. To make clear the fallacy of my colleagues' key assumption, I must briefly sketch the relation of UOP to MSO.
 
 
 41
 MSO, the top holding company, owned, directly and indirectly, the stock of UOP. In turn, UOP owned all the stock of Eureka, and Eureka owned some 82% of the stock of Turman. UOP had issued, and there were outstanding, about $2,400,000 of bonds secured by a pledge of the Eureka stock. Of course, the lien of these bonds on that stock (a first and only lien), and the claim of those bonds for any deficiency, were senior to any interest in the Eureka stock which could be asserted by MSO, the stockholder of UOP, or by stockholders or creditors of MSO (who were but stockholders, or creditors of the stockholder, of UOP). The UOP bondholders were virtually the sole creditors of UOP.
 
 
 42
 Eureka owned some 82% of the stock of Turman which owned the most valuable property of any company in the so-called holding company 'system.' So the receivers had stated in their reports filed in 1927 and 1928. The reorganization plan, dated July 29, 1929, said of Turman that 'it is the most successful and owns the most productive properties of all' the receivership companies. Glass testified before Judge Smith that Turman was 'really the most important (company) in the receivership.'
 
 
 43
 The Supreme Court has recognized that the creation of a single new reorganized company, to take over properties theretofore separate, may be justified, but only 'where unified operations (by a new company) of separate properties (by such a single new company) are deemed advisable and essential.' Consolidated Rock Products Company v. Du Bois, 312 U.S. 510, 530-531, 61 S.Ct. 675, 687, 85 L.Ed. 982; cf. First National Bank of Cincinnati v. Flershem, 290 U.S. 504, 54 S.Ct. 298, 78 L.Ed. 465. Here such a single new company was not at all essential to, but, as we shall see, substantially harmed, the non-depositing bondholders of UOP. But never, so far as appears, did Glass propose, as an alternative to a 'system' reorganization, the separate reorganization, by the UOP bondholders, of UOP. In the long trial leading to this appeal, he did nothing to show, and Judge Smith did not find, that such a separate UOP reorganization was impractical or not markedly more advantageous to UOP bondholders-- as distinguished from MSO stockholders and MSO's other creditors-- than the 'system' reorganization which he recommended.
 
 
 44
 Such a separate reorganization could easily have been accomplished by a foreclosure sale of the Eureka stock, at which the UOP bondholders (with their huge claim for principal and unpaid interest) could have outbid anyone else. The earnings of Turman would have made it entirely feasible for such a separately reorganized UOP company to go it alone; the record contains nothing to indicate (nor does Glass argue) the contrary.[13] In this connection, it must not be overlooked that, as UOP receiver, Glass served as the fiduciary of all the UOP bondholders, not merely those who assented to the reorganization plan.
 
 
 45
 I shall discuss later, in detail, the judge's pressure for a reorganization. Here I note that never did the judge press for a 'system' reorganization; nor did he ever approve the plan, after notice and hearing, as to its fairness. The provision of his order of October 3, 1924, appointing the receivers, that the receivers, during the receivership, should administer the properties of the several companies 'as an entirety,' was not, of course, a direction that a reorganization plan should deal similarly with those properties. Indeed, that very order of October 3, 1924, explicitly provided that the receivers should 'keep and maintain all the properties and assets of the defendant companies separate and distinct from those of the other defendant companies, and do such things and preserve and keep such records as shall maintain and preserve separately at all times the identities of the respective properties of the respective defendant companies, and to open and keep separate books of accounts and records for each and every of the defendant companies so as to show at all times the separate business transactions of the separate defendant companies.'
 
 
 46
 In the light of the foregoing, I now address myself to Glass' personal interests adverse to those of the UOP bondholders.
 
 
 47
 3. Glass' undisclosed personal interest in a fee for services rendered in 1924 to the MSO stockholders' committee.
 
 
 48
 Glass' career in these receiverships illuminates his conduct. That career began in 1924 when, in the court below, as lawyer for Shivers, a stockholder of MSO, in a stockholders' suit, he sought to have a receiver appointed for that company. Before the court took action in that suit, Phelan, a creditor of MSO-- whom Glass did not represent-- filed a bill, also in the court below, seeking a receivership of MSO. The court consolidated the Shivers and Phelan suits, and appointed two receivers. Under an amended and supplemental bill, the same two men were also appointed receivers of UOP and of other companies in the so-called holding company 'system,' including UOP. In those proceedings, Glass, on behalf of his law firm, represented a committee of MSO stockholders.
 
 
 49
 Subsequently, his firm was appointed counsel for the receivers of MSO, UOP and the other companies in receivership.[14] At that time his firm ceased to be counsel for the MSO stockholders' committee, and was succeeded by other lawyers representing it. Still later, on January 27, 1926, he became one of the receivers. For the four years, 1926-1929, he was paid, as receiver, fees of $175,000.[15]
 
 
 50
 But, during those years, he retained his interest in his firm's fee as lawyers for the MSO stockholders' committee, a fact not known to the receivership judge until Glass privately disclosed it to the judge-- but only (on or about January 15, 1930) after the confirmation of the judicial sales, at a time when the judge declared he had no jurisdiction over such matters. In those circumstances, on the direction of the reorganization committee, Glass' firm was paid that fee, consisting of $15,000 in cash and voting trust certificates for 150 Class B shares of the new company.[16] This was not, as my colleagues suggest, compensation 'trifling in value.'
 
 
 51
 Without a 'system' reorganization Glass could not have been paid this fee:
 
 
 52
 Everyone agrees that, at the time of the reorganization, MSO was insolvent and that there was no 'equity' in its stock. Absent the reorganization, then, the MSO stockholders would have had nothing and the MSO stockholders' committee could have paid its lawyers nothing, for their fee was contingent upon a reorganization in which the MSO stockholders participated. But such participation depended on a 'system' reorganization, i.e., one owning or controlling most of the assets of the companies in the system and especially the Eureka stock which was essential to such a reorganization.
 
 
 53
 Thus Glass had a personal interest in bringing about such a reorganization. To achieve just that, he untiringly labored with the reorganization committee, 'organized,' so he reported in May 1928, 'at the suggestion of the receivers.' He wrote a letter, dated July 29, 1929, published in the reorganization plan, urging all securityholders to accept the plan.
 
 
 54
 The reorganization plan provided that the new company would assume payment of counsel for the several committees, including the MSO stockholders' committee, in such amounts as the reorganization committee approved. Because of his hearty cooperation with the reorganization committee was most friendly to that committee was most friendly to Glass, and therefore most likely, if it became the purchaser at the judicial sales, to pay the fee of Glass' firm, as lawyers for the stockholders' committee.[17] It was, then, distinctly to his personal advantage to insure that the reorganization committee should be the successful bidder and that the reorganization plan-- which provided that the new company would own the Eureka stock-- should become effective.
 
 
 55
 Glass' cuttlefish argument.
 
 
 56
 Here Glass tries a cuttlefish argument: He says that, when, in 1924, his firm was succeeded by another firm (the 'Cunningham' firm) as counsel for the MSO stockholders' committee, no arrangement was made to divide the fees; that Jackson, a member of the Cunningham firm, testified that this arrangement for splitting the fee was not made until January 1930; that Glass, on January 15, 1930, first learned 'that it was proposed (by one of Glass' partners) to divide the fee to be paid to the Cunningham firm in lieu of separate fixation of fees for the services successively rendered by' Glass' firm 'and the Cunningham firm as attorneys for the stockholders' committee'; and that Glass then-- i.e., about January 15, 1930-- 'informed the court of those facts.' In so arguing, Glass does not deny the pivotal fact, i.e., that, while acting as UOP receiver, he retained a personal interest in a claim for fees against the stockholders' committee,[18] which interest he did not reveal until he privately disclosed it to the court several seeks after the court confirmed the sales to the reorganization committee. All he then, belatedly, told the court was that he would obtain the fee by sharing in the Cunningham firm's fee instead of by a 'separate fixation.' How that tardy revelation of the fact exculpates him is incomprehensible.[19] The fact that he got his fee by sharing in the Cunningham firm's fee is not the point. The point is that, as receiver, he had secretly retained a contingent right to a fee from the stockholders' committee. See Crites, Inc., v. Prudential Co., 322 U.S. 408, 416, 64 S.Ct. 1075, 88 L.Ed. 1356.
 
 
 57
 His retained and undisclosed interest in that fee should be compared with the statement in the receivers' reports, filed with the court in 1927 and 1928 and then mailed to many securityholders, that the receivers had 'no personal interest in any company as against another.'
 
 
 58
 My colleagues say, concerning this fee, that it did not give rise to any adverse personal interest in Glass because, before the sales, the amount of this fee was unliquidated. But that very fact underscores the existence-- and the vice-- of this adverse interest: The fee was paid only after the 'system' reorganization plan became effective, and would not have been paid otherwise. It was compensation 'dependent upon a particular bidder being successful.' See Crites, Inc., v. Prudential Co., 322 U.S. 408, 416, 64 S.Ct. 1075, 1080. Surely such an interest was not 'remote or speculative.' (See discussion, infra, in point 5.)
 
 
 59
 4. Glass' personal interest in Hamburg's fee.
 
 
 60
 In August 1926, Hamburg, together with his associates, Ausberry and Barton, applied for an interim allowance of $10,000 for services in connection with the receivership tax matters. On August 25, 1926, Glass wrote the receivership judge a private letter (not made part of the court records) stating that he wanted the judge to know, before he acted on this application, that there was 'an arrangement whereby my firm has an interest in all his (Hamburg's) business in return for rent, office accommodations and services and business referred to him.'
 
 
 61
 More than three years later, on December 23, 1929, just before confirmation of the sales, Hamburg applied in open court for a final allowance. Glass, who was present, did not then state to the court that this 'arrangement' had continued and was still operative. Later, on February 4, 1930, about six weeks after confirmation of the sales,[20] Glass wrote the receivership judge a letter (not made part of the court records), reminding him of the 1926 letter, and saying 'this interest continues at this time.' Hamburg received a final allowance of apparently $62,500 in which Glass shares (in an amount not disclosed).
 
 
 62
 The fact that Glass felt the need of writing this letter of February 4, 1930, to remind the judge of the 1926 letter, goes to show that the judge, before he confirmed the sales in December 1929, did not know that Glass had a continuing interest in Hamburg's fee.[21] Since the judge had no such knowledge at that time, we have another instance of Glass' personal interest tending adversely to affect his loyalty as receiver. For a receiver, unburdened by conflicting interests, might have felt it necessary to suggest, to the court, reorganization of UOP separately. But Glass, as a beneficiary of Hamburg's potential award, was interested in effecting a plan whereby all of the assets from which the award would be paid would be in hands not likely to oppose the claim, i.e., a 'system' reorganization in which control was exercised by persons friendly to Glass. Perhaps Glass' stake in the Hamburg claim was insufficient to influence his judgment in respect of so major a question; but the very possibility of conflict created, at a minimum, the duty of the very fullest disclosure to the judge before confirmation of the sales-- a duty Glass did not perform. Crites, Inc., v. Prudential Co., 322 U.S. 408, 416, 64 S.Ct. 1075.
 
 
 63
 5. Glass' undisclosed expectation of becoming lawyer for the reorganized company.
 
 
 64
 Before the confirmation of the sales, Glass had rejected suggestions by the reorganizers that he become president of the new company. He did accept that post after the reorganization; but I agree with my colleagues that, on the evidence and the findings of Judge Smith, any expectation of becoming president cannot be considered as motivating Glass' conduct.
 
 
 65
 My colleagues, however, concede that, long before the judicial sales, Glass had 'quite frankly declared' that he would like to be 'lawyer for the reorganized company.'[22] Since the reorganizers were eager to have him as president, it goes without saying that Glass knew that the reorganizers would satisfy his desire to attain the less important position of lawyer for the new company. Therefore he had far more than a mere 'hope': His selection as lawyer did not (as my colleagues say it did) depend on what the 'administration' of the new company 'might decide.' For he had a virtual assurance from the reorganizers that the new company would choose him. To be sure, this assurance could not be carried out unless the reorganization committee became the successful bidder at the judicial sales. But that contingency cannot obliterate the fact that Glass had an interest in conflict with his duty of undivided loyalty.[23] This interest was not disclosed to the receivership judge.
 
 
 66
 My colleagues say that this interest was 'too remote,' 'too feeble an inducement to be a determining motive.' That might have been true if a 'system' reorganization had been essential, since then perhaps it would have done the UOP bondholders no harm to have Glass aid such a reorganization; in such circumstances, perhaps it could have been said that this motive would not appreciably deflect his loyalty to them.[24] But, since a 'system' reorganization was not essential, that motive may well have counted heavily in influencing him to plump for such a reorganization as against a separate reorganization of UOP. It is this factor, neglected by my colleagues, which renders inapposite the cases they cite.
 
 
 67
 In Bullivant v. First National Bank, 246 Mass. 324, 141 N.E. 41, the plaintiff, president of a failing corporation, entrusted his shares in the corporation to the defendant, a creditor of the corporation, and agreed (subject to minor limitations) that the bank, as voting trustee of the shares, would have full ownership rights in them for three years. The plaintiff then sought, in derogation of that agreement, to enjoin the bank from voting the stock in favor of a proposed plan of reorganization, on the ground of conflict between the bank's interest as trustee and as creditor. The injunction was denied, for the bank was a creditor at the time of the agreement-- a fact which was then surely known to the plaintiff-- so that the bank's dual interest was created by the beneficiary and not concealed from him.
 
 
 68
 In Anderson v. Bean, 272 Mass. 432, 172 N.E. 647, 72 A.L.R. 959, the trustee owned approximately half of the shares of a corporation in his own right and the other half as trustee. He sold a part of his trusteeship holdings, and thus put his personal holdings in a dominant voting position. The beneficiaries sought to surcharge him. The court found that the new arrangement was of 'no harm to the trust' and 'no profit to the trustee.' Perhaps the court was wrong in believing there was no advantage to the trustee; but the relevant fact, for present purposes, is that the court thought there was no advantage, and therefore an inquiry, into whether his actions were influenced by hope of private gain, would have been meaningless.
 
 
 69
 In re Harton's Estate, 331 Pa. 507, 1 A.2d 292, and in Pike v. Camden Trust Co., 128 N.J.Eq. 414, 16 A.2d 634, a trust company, which took over mortgages and allotted participation certificates to trust estates administered by it, also acted as rental agent for the mortgagor, and its commission as agent was deducted from distributions of income to the participating certificate-holders. The courts in each of these cases held there was no conflict of interests, and that a trustee may be compensated for a service performed as part of the administration of the trust estate.
 
 
 70
 These two cases reflect a recent tendency toward relaxing the strict rule that a trustee may not employ himself because, in so doing, 'he cannot perform one part of his trust, namely, that of seeing that no improper charges are made.' See Broughton v. Broughton, 5 DeGex, M. & G. 160; Gray v. Robertson, 174 Ill. 242, 51 N.E. 248. Bogert, to whom relaxation of the rule is apparently distasteful, explains the relaxation on the ground that the court is confronted with a situation in which a service has already been performed for the estate and that to deny the award would unjustly enrich the estate. 3 Bogert, Trusts 142. Whatever the reason, however, the conflict of interests created by a trustee employing himself as lawyer, rental agent, or whatever, can affect his judgment in only one small matter, i.e., passing on the award to be made to himself for the service rendered, while the conflict of interests in Glass' situation might have affected his judgment in respect of major matters.
 
 
 71
 In Dabney v. Chase National Bank, 2 Cir., 196 F.2d 668, there was only a possibility of a conflict of interest dependent upon a series of unlikely contingencies which, in fact, did not come about. In the instant case, the conflict depended on only one contingency-- a system reorganization-- and the trustee, far from leaving the contingency to chance, was active in bringing it about.
 
 
 72
 My colleagues quote a short excerpt from a passage in our opinion in York v. Guaranty Trust Company, 2 Cir., 143 F.2d 503, 514. I think the entire passage, reading as follows, states the applicable rule: 'Of course, the courts should not impose impractical obligations on a trustee. Merely vague or remote possible selfish advantages to a trustee are not sufficient to prove such an adverse interest as to bring his conduct into question. But here the advantages seem not to have been thus vague or remote. That a trustee owes his beneficiaries undivided loyalty entirely untinged by considerations of any important benefits to himself is an old truth, and one whose edge cannot be dulled by frequent use. If the trustee here allowed its judgment to be affected by any such factors, it acted improperly. Cf. Pepper v. Litton, 308 U.S. 295, 311, 60 S.Ct. 238, 84 L.Ed. 281. If it failed to exercise the powers it held in trust because it entertained a belief that such inaction might be to its own substantial benefit (while failing to consider the consequent harm to any of its beneficiaries) then it breached its obligations, regardless of whether its belief, objectively viewed, was illusory. That is to say, the trustee should be held liable if the trial court reasonably infers from the evidence at the trial that the trustee, in making its decision, was moved to do so in any degree by the thought that it might incidentally secure a substantial advantage to itself. In such circumstances, nothing would turn on the fact that the trustee did not in fact derive benefits, if its inactivity caused loss to any of its beneficiaries.'
 
 
 73
 Glass cites Acker v. Hamilton, 66 App.D.C. 171, 85 F.2d 574, 575, 576, as if the court there had held that an 'expectant relationship' does nor suffice to create a conflicting interest. There, pursuant to statute, the Comptroller of the Currency took charge of a bank and determined that it was insolvent. Stockholders, who were assessed on their bank stock, complained that a sale to another bank by the Conservator, who had been appointed by the Comptroller, was unfair (and resulted in a large deficiency). They argued that, before the sale, the Conservator had been designated as vice-president of the purchasing bank and, after the purchase, was actually elected to that position. The court said: (1) 'The sale realized the full present market value' of the assets sold. (2) The Comptroller had arranged the sale, and the Conservator 'served only as mediums through which the scheme of salvage was effected. Here there was neither occasion nor opportunity for the conservator of this bank to consult his private interests. He acted as the mouthpiece or agent of the Comptroller. The sale, therefore, was the Comptroller's sale, and it is obvious the conservator neither had nor could have any private interests to serve.' (3) The Conservator's designation as vice-president 'was not secret, but was commonly known.' All these circumstances, the court said, must 'qualify' the usual rule regarding fiduciaries 'to the extent that something more than this expectant relationship ought to be shown before a transaction should be condemned and set aside which is fair and equitable in all respects-- and in which the conservator acted only by authority of his superior.' Plainly, if the numerous qualifying facts, stated by the court, had been absent, it would have held the other way.
 
 
 74
 6. Glass favored the junior interests at the expense of the UOP bonds.
 
 
 75
 During the receivership, not one cent of interest on the UOP bonds was paid. Glass explains this fact thus: By October 1929, this unpaid interest (with interest thereon) aggregated about $1,725,000. Payment of this huge sum (says Glass) was impossible, since the sole means by which the necessary funds could have been obtained was payment of dividends by Turman to Eureka, and Turman was in such financial condition that it could not have paid out $1,725,000.
 
 
 76
 But that is not the question. The question is whether not all but some ponderable part of that interest could have been paid. Had it been, then, just to that extent, the UOP bondholders would have benefited. But, just to that extent MSO stockholders and creditors would have been disadvantaged, and the achievement of a 'system' reorganization would probably have been frustrated. This appears from the statement to the court, on March 9, 1929, of Lehman, the lawyer for certain creditors of MSO (the MSO Serial Noteholders' Committee) that the receivers 'have been using the money, which should go to the (UOP) bondholders, for the purpose of improving the property for the benefit of all the securityholders of Middle States Oil Corporation' including its stockholders. Glass here favored the MSO stockholders and aided the 'system' reorganization in which he had a personal stake.
 
 
 77
 There is evidence-- in addition to Lehman's candid statement, undisputed by Glass who was present at the time-- that it was possible, long before the sales, to pay some considerable part of the overdue interest:
 
 
 78
 (a) Judge Smith found, 'In the early stages of the receivership an attempt had been made (in the so-called Manning suit) to obtain a domiciliary receivership in Delaware which had been defeated primarily on the basis of testimony by Glass who had become one of the (federal court) receivers, to the effect that the companies were solvent in the sense that they either had or could obtain whatever funds were needed to meet their admitted obligations.' (124 F.Supp. 732.) In that Delaware suit, Glass testified that one of the ways to meet those obligations was by his causing subsidiary companies to declare and pay dividends. At the trial before Judge Smith, Glass endeavored to explain away this testimony. Judge Smith found that Glass was 'unconvincing' in 'his testimony as to the meaning of his statements on the Manning trial in Delaware.'
 
 
 79
 (b) As Judge Smith also found, the receivers, for other purposes, caused MSO to borrow money from subsidiaries for acquisition of property or to discharge debts. As already noted, the principal oil production and revenues of the receivership companies derived from the properties in the Seminole field, owned by Turman. In their report to the court on May 7, 1928, the receivers stated that, by reason of the Seminole development, the position of the Middle States companies had greatly improved and that 'claims against the companies, $1,808,033.93, have actually been paid off out of income during receivership.'[25] Yet not a cent went to pay any of the interest on the UOP bonds.
 
 
 80
 (c) Glass now argues that, until the beginning of 1928, when the matter was settled, there was litigation affecting the title of Eureka to 30% of the Turman stock. But, even so, this left Eureka, before 1928, with about 52% of Turman stock not in dispute, so that apparently Eureka could have caused Turman to declare substantial cash dividends which could then have been used, in large part, to pay United bond interest. Moreover, when the dispute re the Turman stock was settled, Eureka then held, undisputed, 82% of the Turman stock.[26]
 
 
 81
 Judge Smith made no finding on the subject of the ability, during the receivership and months before the judicial sales, to pay a substantial portion of the interest. He found merely that, at the time of the order directing those sales-- i.e., November 1929-- United could not 'have continued[27] to pay the interest on the bonds.' This is not a finding that UOP could not have paid some considerable segment of the overdue interest long before that date. Significantly, my colleagues do not discuss this question.
 
 
 82
 Even if it be assumed that, on this issue, the appellants had the proof-burden, I think they discharged it. If, because of his selfish interest, Glass had that burden, he did not discharge it.
 
 
 83
 Appellants make a more sweeping contention. They argue that, all other factors aside, Glass' conduct with reference to the non-payment of interest was alone enough to put on him the burden of proof as to all phases of the case. Answering this argument, my colleagues take this position: The court, since it appointed Glass receiver of both MSO and UOP, necessarily put him in a position where, if any conflict arose between UOP interests and MSO interests, he had the implied authority-- indeed the implied duty-- to decide that conflict according to his own best judgment. If, say my colleagues, he decided adversely to UOP interests, and did so erroneously, he was liable to the UOP bondholders, but the burden of proving the extent of the loss was on them, since an erroneous decision involved no deviation from his undivided-loyalty duty because the court, by impliedly imposing on him the authority to make such a decision, relieved him of that duty.
 
 
 84
 In taking this position, I think my colleagues overlook the following: The cases hold that a trustee's duty of undivided loyalty is breached not only when he is (or might be) motivated by his own self-interest but also where he acts in the interest of any third person; and the cases also hold that one who is a trustee of two trusts, if he engages in dealings between the trusts, is guilty of disloyalty to one or the other, unless he shows that the transaction is fair to both, and that his duty requires him, in cases of doubt concerning such a conflict, either to resign as trustee of one of the trusts, or to refrain from acting until he has obtained the instructions of a court.[28] Thus the Restatement of Trusts, § 170, states: 'The trustee is under a duty to the beneficiary to administer the trust solely in the interest of the beneficiary,' and adds the following comments on that rule: 'p. Action in the interest of a third person. The trustee is under a duty to the beneficiary in administering the trust not to be guided by the interest of any third person. Thus, it is improper for the trustee to sell trust property to a third person for the purpose of benefiting the third person rather than the trust estate. q. Duty of trustee under separate trusts. Where the trustee is trustee of two trusts, if he enters into a transaction involving dealing between the two trusts, he must justify the transaction as being fair to each trust. If the circumstances are such that the interests of the beneficiaries of the different trusts are so conflicting that the trustee cannot deal fairly with respect to both trusts, he cannot properly act without applying to the court for instructions.' See, e.g., Mosser v. Darrow, 341 U.S. 267, 71 S.Ct. 680, 95 L.Ed. 927; Detroit Trust Company v. Mason, 309 Mich. 281, 306, 15 N.W.2d 475; In re Sedgwick's Will, 74 Ohio App. 444, 59 N.E.2d 616, 624; cf. Berner v. Equitable Office Building Corp., 2 Cir., 175 F.2d 218, 221. In the case of a receiver, receipt of such judicial instructions has been uniformly required. See, e.g., Northern Finance Corp. v. Byrnes, 8 Cir., 5 F.2d 11, 12-13.[29]
 
 
 85
 The receivers did not seek or obtain the instructions of the court in respect of non-payment of the interest. True, in March 1928, and again in March 1929, others brought the non-payment to the court's attention, and the court did not then order that any part of the overdue interest be paid. But I incline to doubt whether the court's failure to enter such an order amounts to an instruction or to a ratification of the receivers' previous inaction.
 
 
 86
 7. Effect of Glass' personal interests: He had the burden of proof.
 
 
 87
 At any rate, disregarding the facts just narrated in point 6, those discussed in points 3 and 5, supra,[30] suffice, I think, to put the burden of proof on Glass.[31] If so, Judge Smith's findings of fact, so far as favorable to Glass, crumble-- i.e., cannot be held not 'clearly erroneous'-- since he rested them on his legal conclusions that (a) Glass had not violated his loyalty-duty and therefore (b) did not have the burden of proof.
 
 
 88
 My colleagues virtually admit that, if Glass had that burden, there is a lack of foundation for their ruling as to the fairness of the prices bid at the sales, and in particular, the price of the Eureka stock.
 
 
 89
 Glass delay and the loss of evidence.
 
 
 90
 Before I go further, I think it well to bring out a feature of this case which emphasizes Glass' burden of proof: Glass delayed filing his final account, and seeking discharge, as receiver of UOP, from the time of the confirmation of the judicial sales, at the close of 1929, until 1945 (and he then filed that account only after appellants procured an order directing him to do so). Some part of that delay is understandable. But why he waited fifteen years, Glass has never explained. Yet he asserts that he has been harmed because, during those fifteen years, documentary evidence has been lost and important witnesses have died. Surely this is a shoe-on-the-wrong-foot argument: The harm is to appellants. Cf. the discussion of delays in Southern Pacific Company v. Bogert, 250 U.S. 483, 39 S.Ct. 533, 63 L.Ed. 1099, and Northern Pacific Ry. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931. Glass has put this court in a position where it must look at the facts as through a glass darkly:[32] Thanks to this delay, this case is one of the most complicated our court has ever encountered; we have devoted many months to a study of the record. (I disagree with some of the findings of Judge Smith, who was not the receivership judge, but, considering the complexities, that he made some mistakes of fact is not surprising; and I join my colleagues in criticizing that part of appellants' brief which imputes to Judge Smith a partiality in favor of the receivers.)
 
 
 91
 In 1944, appellants asked Glass, as receiver, for information concerning UOP. He refused this request. In 1945 they made a motion that they be allowed access to important receivership papers, never filed as part of the court's records but which Glass had in his possession; Glass filed an affidavit in opposition, in which he astonishingly referred to 'the danger' of making such information available to them.[33] Judge Smith said that there was 'a number of instances of impatience of Glass with requests for full information', and that because of his 'reluctance to make full disclosures', Glass had no 'cause * * * to complain about the burdens to which he has been put by reason of objectants' (appellants') attempts to develop the full story * * * which the objectants believed would substantiate their suspicions of wrongdoing. * * * The delay (in filing his final account) alone would give some basis for objectants' suspicious.'
 
 
 92
 Concerning this delay, Judge Smith added: 'His duty to the Court, * * * so long as any of the receiverships remained open, was to complete the work * * * of winding up the affairs of all the estates so that any minorities which had any surviving interest might have an opportunity to be heard on his discharge from his receivership duties.'[34] (124 F.Supp. 728, 779) Much in point, then, are these remarks of the Supreme Court in Mosser v. Darrow, 341 U.S. 267, 274-275, 71 S.Ct. 680, 683, 95 L.Ed. 927, concerning a bankruptcy trustee: 'A further remedy of a trustee for limiting, if not avoiding, personal liability is to account at prompt intervals, which puts upon objectors the burden of raising their objections. * * * It hardly lies in the mouth of a trustee to allow his liabilities to accumulate over such a period of time and then ask the court to relieve him of them because they have become too burdensome.' Cf. Matter of Hubbell's Will, 302 N.Y. 246, 254, 97 N.E.2d 888.
 
 
 93
 Our decision, in 1946, directed a full hearing on appellants' objections to Glass' discharge. In the long resultant trial before Judge Smith, there became known, for the first time, the facts concerning Glass' personal interests, adverse to the UOP bondholders, which could not have been ascertained from a search of the court's records or files.
 
 
 94
 8. Glass abandons neutrality: He helps to bring about forced sales at prices tailored to a 'system' reorganization, in violation of the doctrine of First National Bank v. Flershem, 290 U.S. 504, 54 S.Ct. 298.
 
 
 95
 As a receiver, Glass had no obligation to help in the formulation and consummation of a reorganization of any of the companies in receivership; and, insofar as he did participate in such an effort, his duty was to remain neutral, as among the several interests. But, as above pointed out, Glass assiduously sought to accomplish a 'system' reorganization; and the evidence reveals that a reorganization of the other companies, not including UOP, would have been decidedly less desirable from the point of view of the interest junior to the UOP bonds, as distinguished from that of the holders of those bonds. Remembering that Glass had come into this story initially as representative of those junior interests, and that he would profit personally from a 'system' reorganization, it is not difficult to understand why he persistently pushed for such a reorganization.
 
 
 96
 First National Bank of Cincinnati v. Flershem, 290 U.S. 504, 54 S.Ct. 298, shows how such a dominant purpose to preserve a 'system' as an 'entirety' could well work injustice to the non-assenting UOP bondholders. It teaches that, except in the case of a railroad or the like, a 'unitary' reorganization should be regarded with marked suspicion.
 
 
 97
 The attitude of Glass and the reorganization committee towards non-depositors sheds light on their arbitrary method of picking the prices to be paid at the judicial sales:
 
 
 98
 (a) Judge Smith said of 'the receivers and reorganizers', 'They may have, and probably did, as was normal practice in those days, desired to effect a reorganization to be controlled by the interests represented on the reorganization committee.' Whether that was 'normal' practice in 1929 is questionable. But, even if it was then the usual practice, that fact cannot serve as a defense. For in First National Bank of Cincinnati v. Flershem, 1934, 290 U.S. 504, 54 S.Ct. 298, the court overturned such a practice adopted in a reorganization consummated in 1931. If this were a suit against the members of the reorganization committee for damages, perhaps their good faith belief in the normality of their methods would be pertinent. But that defense is not open to Glass, a receiver who had a personal interest in promoting a reorganization which disregarded the welfare of non-depositing UOP bondholders who were not 'represented on the reorganization committee' but whom Glass did represent.
 
 
 99
 (b) Arkush, the lawyer consulted by Glass and the reorganization committee as a reorganization expert, testified that Glass and the committee chose, as the sales prices, 66 2/3% of what they estimated as the 'going-concern value' of each of the properties. Asked why they picked 66 2/3%, he answered that that was then the conventional percentage used in connection with reorganizations, in order to make acceptance of a plan more attractive than the amount of cash payable to a non-depositor. That percentage was therefore purely arbitrary. In agreeing to those prices, Glass agreed that, as it turned out, the non-depositing UOP bondholders should receive in cash but approximately 69.8% of the face of their bonds and but 39% of the amount due them for principal and unpaid interest. (Even that amount of cash was not payable until about 3 1/2 years after the effective date of the plan and then without interest for those years.)
 
 
 100
 The method here used of fixing judicial sales prices-- tailored to a 'system' reorganization plan-- was condemned in First National Bank of Cincinnati v. Flershem, 290 U.S. 504, 54 S.Ct. 298, 308.[35] The Court made it plain that the prices paid at a judicial sale in such circumstances are not to be considered the same as prices at the usual 'forced sale.' The Court said that, as the aim should be 'to secure for nonassening creditors the largest possible sum in cash,' it was error to treat 'the receiver's sale as merely a necessary step in effectuating the plan of reorganization.'
 
 
 101
 9. Glass' tainted advice vitiates the order confirming the sales.
 
 
 102
 It is suggested that the prices agreed upon by the reorganization committee with Glass' concurrence, were, in effect, 'upset prices.' But an 'upset price' is one determined by the court before the sale, after notice and hearing to all interested persons. It could be 'a weapon with which the court' is able to 'bargain with the committee,' by insuring that the property will not be sold at too low a figure from the point of view of those not assenting to the plan.[36] Here the reorganizers, with Glass' approval, deliberately decided not to ask the court to fix upset prices-- and the court did not fix them.
 
 
 103
 Glass argues that, before the sales, the receivership judge-- in private, be it noted, not in open court-- had been informed by Glass and the committees of the details of the reorganization plan; that consequently, in confirming the sales, the judge impliedly approved the plan; and that the judge thus acted on full information, when, by confirmation, he approved the prices, which therefore must be deemed to have been informedly adjudicated as fair. To this argument, there are several answers:
 
 
 104
 (a) Any receivership court properly regards its receiver as its eyes and ears. In this case, to more than the usual degree, the receivership judge leaned on Glass' advice-- and Glass had helped to fix the prices. But the judge did not know, before the sales' confirmation, that this advice was tainted, i.e., that Glass had personal interests, then undisclosed to the judge, contingent upon the consummation of the reorganization plan via the judicial sales at the prices agreed upon by Glass and the reorganization committee. On account of this taint, Glass cannot hide behind the confirmation of the sales.[37]
 
 
 105
 Glass makes much of the fact that the judge, on his own initiative, asked for and received (in private) the independent judgment, as to values, of Cannon, an assistant to the receivers. But Cannon-- who, before the receiverships, had been president of MSO-- in replying to the judge, frankly stated that he was interested 'in behalf of the MSO stockholders.' Moreover, he said that if all the assets of UOP were sold, the UOP stockholders would receive the face amount of their bonds.
 
 
 106
 (b) The court deviated from 'standard practice' by not holding a hearing, on notice, as to the plan's fairness:
 
 
 107
 The reorganization committee, after carefully canvassing the question, deliberately decided, with Glass' concurrence, not to ask the court, after a hearing, to pass on the fairness of the plan,[38] and the court explicitly stated that it refrained from doing so.
 
 
 108
 Glass argues that in 1929 it was not the practice in such receiverships for the court to hold a hearing, on notice to all interested persons, and then to pass on a plan's fairness. I cannot agree. The Boyd case, 228 U.S. 482, 33 S.Ct. 554, had been decided in 1913. As a result, in the Missouri-Pacific reorganization in 1916-- thirteen years before confirmation of the sales in the instant case-- the decree provided that the court, in advance of the foreclosure decree, would, after notice, hear complaints as to the fairness of the plan's offers to various named classes of creditors, including bondholders.[39] With minor variations, this became the 'standard practice.'[40]
 
 
 109
 In 1926, in the important receivership-reorganization of the industrial, Wilson & Company, Inc.,[41] in the federal district court for the Southern District of New York-- the very court in which the receiverships of UOP and MSO were then being administered-- Judge Bondy, in the decree of sale, entered January 23, 1926, provided that, on February 11, 1926, before the sale, he would hold a hearing on complaints by interested persons as to whether the offers to creditors and securityholders, set forth in the reorganization plan, were fair, timely and equitable. He held such a hearing, at which no one appeared and complained. On February 13, 1926, before the sale, he entered an order that the offers were fair, timely and equitable. At the sale, on February 26, the successful bidder was the reorganization committee; and the judge confirmed the sale on the same day.
 
 
 110
 In December 1927-- two years before confirmation of the sales in the instant case-- there appeared in 27 Col.L.Rev. 901, an article by Swaine (a leading reorganization lawyer) which reported that, in all cases of railroad reorganizations and in many cases of public utility and industrial reorganizations, the federal courts, after the Missouri-Pacific reorganization, had employed (indeed improved upon) the method there employed.[42] Doubtless, this practice, well-established by 1929, was known to Arkush, the reorganization specialist, and was communicated by him to Glass and the reorganization committee who asked and acted upon his advice.[43] The outstanding fact here is that, with Glass' assent, the fairness of the plan was not considered by the court after notice and a hearing thereon.
 
 
 111
 The indenture trustee and Glass' tainted advice.
 
 
 112
 Glass argues that the acquiescence in the confirmation by the indenture trustee, under the indenture securing the UOP bonds, bound all the holders of the undeposited UOP bonds. But, since the indenture trustee justifiably relied upon Glass' views, and since they were tainted by his self-interest, Glass cannot use that acquiescence to shield him from liability to holders of undeposited bonds. Moreover, when a receiver has an interest conflicting with his undivided-loyalty obligation, confirmation of a sale does not exculpate him. Crites, Inc., v. Prudential Company, 322 U.S. 408, 64 S.Ct. 1075, 88 L.Ed. 1356; Woods v. City Bank & Trust Co., 312 U.S. 262, 61 S.Ct. 493, 85 L.Ed. 820; cf. President & Directors of Manhattan Co. v. Kelby, 2 Cir., 147 F.2d 465, 476; Restatement of Trusts, Sec. 170, Comment c.
 
 
 113
 10. Unfair price paid for Eureka stock.
 
 
 114
 Glass' basic argument, which my colleagues adopt, is (a) that Judge Smith found that the price paid for the Eureka stock was fair, and (b) that therefore any misconduct by Glass with respect to the sale of that stock is immaterial. I think that Judge Smith's finding is 'clearly erroneous,' even if appellants had the burden of proof, and especially so if Glass had it.
 
 
 115
 The reorganization committee, with Glass' approval, agreed that the committee at the sale should pay for the Eureka stock, and it did, $1,450,000. This figure, as above noted, was 2/3 of what the committee said it believed to be the fair going-concern value of that stock. Its going-concern valuation, on that basis, was therefore $2,175,000. In finding-- some twenty-two years after the sales-- that $1,450,000 was a fair price, Judge Smith used several tests. As my colleagues, however, employ but two of those tests, I shall discuss them only.
 
 
 116
 (a) The first consists not of market prices but of average bid and asked prices of the Turman stock for a period of nine months in 1929. As my colleagues note, most courts spurn such a criterion because of its extremely shaky character. Here it is singularly shaky: Only a small part of these shares were on the market. Public information about Turman's affairs was scanty.[44] Turman was owned by a company in receivership; and Glass, on October 31, 1929, himself stated, 'There is no doubt in my mind that any company can operate out of receivership far more economically than in receivership.' Even actual market prices would not reflect the value of the controlling block-- 82%-- of the Turman shares owned by Eureka. Glass, as receiver, in April 1927, purchased, at a private sale, some Turman shares at $9.72 a share, reporting To the court that, if there were an attempt to purchase 'any substantial block in the market,' the 'price would rise substantially' above that figure.
 
 
 117
 (b) Capitalization of earnings:
 
 
 118
 One of the tests applied by Judge Smith, and the one on which my colleagues primarily rely, is the capitalization of 'reasonably to be expected' net annual earnings, ascertained by using actual part average annual earnings. This I think the correct yardstick.[45]
 
 
 119
 Judge Smith took the average earnings of Turman for the five years, 1924-1929; allotted 82% to Eureka; capitalized at 10%; and so reached a figure of $1,504,936.78.
 
 
 120
 My colleagues, after some discussion, concluded that the proper years are not 1924-1929, but the four years, 1925-1929. They also admit (somewhat grudgingly) that, to those earnings, there should be added certain deducted non-recurrent expenses. I agree. My colleagues say, correctly, that thus computed, the average net earnings of Turman for the four years, 1926-1929, were $414,500, and of Eureka, 82% thereof-- which is approximately $339,800. Using Judge Smith's capitalization percentage-- 10%-- Eureka's fair market value was $3,398,000.
 
 
 121
 But my colleagues reject Judge Smith's finding that 10% was the correct capitalization percentage. Instead, my colleagues use 19.31%, and so reach a figure of $1,775,000. In justifying the use of 19.31%, my colleagues rely entirely on an exhibit showing the prices and earnings per share of nine other oil-producing companies in 1929, as reported in Moody's Manual of Investments (1930 ed.).[46] Other than the testimony of Glass, there was no evidence whatever that these companies were comparable with Turman. For all we know, they were not, for any one or more of a dozen reasons. Glass briefly testified[47] that they were a 'selected' group of companies 'that were generally comparable to Turman.' He added not a syllable to explain why these companies were 'comparable.' Most significantly, Judge Smith, who saw and heard Glass when he testified, did not, in his findings, mention that testimony or that exhibit, or even intimate that, from the evidence, any capitalization figure other than 10% was correct. Accordingly, I think that this court-- which, of course, did not observe Glass when he so testified-- may not properly rely on that evidence, but must accept, as not 'clearly erroneous,' Judge Smith's finding that 10% is the proper figure.
 
 
 122
 On April 28, 1941, Glass wrote a letter to stockholders of MSP, concerning the correct valuation of its assets. He supported a valuation based upon a capitalization of four years' average annual earnings (derived from oil operations) at 10.66%, saying, 'I would have no difficulty in interesting very shrewd businessmen, clients of mine, amply responsible, in buying the assets of MSP on the basis of that kind of valuation. * * * I would not have the slightest hesitancy in recommending such a purchase and in personally participating with them in such a purchase.'
 
 
 123
 I repeat that, on a 10% capitalization basis, found by Judge Smith to be correct as of December 1929, the fair market value of Eureka was about $3,398,000. Even assuming-- an erroneous assumption-- that it was proper to take but 2/3 of that value, or $2,265,000, as the fair price at the judicial sale, the actual price paid ($1,450,000) was insufficient in the amount of $815,000.
 
 
 124
 Even the four-year average may be unfair to the UOP bondholders. For Turman had not had a large production until July 1926. In the short period of some three months, December 31, 1926 to April 10, 1927, its production apparently increased by some 2500%. It may well be, therefore, that the average earnings should be those for the three years, 1927-1929. On that basis, Eureka's average annual earnings were $401,800, which capitalized at 10%, yields $4,018,000. Even assuming that 2/3 of that sum represented a fair price at the judicial sale, we get a figure of $3,678,000-- or $1,228,000 more than the actual price paid for the Eureka stock at that sale.[48]
 
 
 125
 Be that as it may, it is clear, I think, that, even on the assumption that appellants had the burden of proof, they have shown a substantial loss (aside from any loss on the sale of the unpledged UOP assets, which I shall discuss later). A fortiori, is this true, if Glass had the burden of proof.
 
 
 126
 11. Judge Smith found that Glass underwrote the fairness of the prices.
 
 
 127
 It was Glass' duty, as receiver, to do everything possible to procure the highest prices at the sales. But he did next to nothing in attempting to stir up interest in possible purchasers, in particular purchasers for the Eureka stock. Judge Smith so found.[49]
 
 
 128
 My colleagues say that on September 25, 1928, on June 1, 1929 and on November 13, 1929, 'Glass did establish contact with corporations, American or Canadian, which might have been interested in merging with MSO.' But Glass' testimony discloses that, in each of those instances, Glass did not solicit the company: The company sought him. And the meager testimony on this score is that Glass merely supplied such companies with information, did not try to persuade them to buy, and made no attempt to interest them in a purchase of Eureka separately, as distinguished from a purchase of MSO's entire assets. Little weight should be given to this evidence, since Judge Smith, of course aware of it, found that Glass used no real efforts to interest 'outside bidders.'
 
 
 129
 Glass had made himself peculiarly responsible for diligence in finding such bidders: In receivers' reports, filed with the court, he had repeatedly proclaimed a 'position of disinterestedness' in support of a reorganization which would 'accomplish substantial justice to all of the interested parties.' In a letter, dated July 29, 1929, incorporated with his approval in the published reorganization plan, he quoted that statement from those reports, said that the published plan did accord 'substantial justice to all of the interests involved,' and ended by stating that he saw 'no reason for the continuance of the receivership and every reason for the prompt consummation of the reorganization, which we strongly urge.' In effect, Glass thus virtually underwrote the fairness of the amount to be paid nonassenting UOP holders, and consequently had an emphatic obligation to stir up potential bidders at the sales. So we said in our previous opinion, 154 F.2d 978, at page 993. Judge Smith so found, stating, 'Glass must be held to have underwritten the fairness of the bids.' Judge Smith further found that 'the repeated representations by the receivers as to fairness of the plan and consideration for the rights of minorities, placed an extraordinary burden * * * upon the receivers * * * to see that substantial and not only technical, protection was given the minorities no matter how small their proportional interest in any given situation might be.' Judge Smith also spoke of the 'failure of the receivers more actively to seek and to inform purchasers * * * in view of the receivers' assurances to the minority interests,' and said that these assurances 'made the receivers * * * insurers of the fairness of the plan as well as of the adequacy of the bids.' (124 F.Supp. 780, 789.) The non-deposited bondholders therefore had a right to believe that the UOP assets could not be sold for a sum sufficient to yield them more than $698 per $1000 bond (face amount).
 
 
 130
 Judge Smith, despite this finding, quoted above, held Glass not liable, because he found that the price paid for the Eureka stock was fair, a finding which (for reasons above stated) I think 'clearly erroneous,' especially if Glass had the burden of proof.
 
 
 131
 12. No information re Eureka to potential 'outside' bidders.
 
 
 132
 Glass' failure to stir up potential buyers becomes of major importance because the notice of the foreclosure sale of the Eureka stock did nothing to enlighten buyers concerning the assets or earnings of Eureka. That notice-- the only one advising that that stock was to be sold-- said merely that the sale was being made pursuant to a decree of November 15, 1929, in the suit of Chatham Phenix Bank against UOP, and stated the date, place, and briefly, the terms of the sale. The notice ended with this sentence: 'For further particulars, including a more particular description of the terms of sale, intending purchasers are hereby referred to said decree.'
 
 
 133
 The decree was entered in a foreclosure suit which rested on diversity of citizenship, i.e., that suit was not ancillary to the receivership. If a prospective purchaser had read the decree, he would not have seen a word to the effect that Eureka owned some 82% of Turman's stock or referring to the earnings or assets of Turman. The decree did not refer to the receivership or the receivers; and the notice of sale did not suggest any source from which a prospective buyer could learn anything about the earnings or assets of Eureka or Turman.
 
 
 134
 In this respect, the decree and notice of sale differ, strikingly, from the decree of November 22, 1929, dealing with the sale of the unpledged UOP assets, and the notice of that sale. Nor would anyone reading the notice of sale of the unpledged assets see any reference to the sale of the Eureka stock.
 
 
 135
 Moreover, one reading the notice of sale of the Eureka stock, had he searched the court records, would not have discovered the data as to Turman's earnings or assets-- all of which data Glass had, long before, furnished to the reorganization committee. Glass, Judge Smith and my colleagues answer that the reorganization plan, published months before the notice of sale of the Eureka stock, contained this information. But-- apart from the fact that the plan omitted the most important part of such information-- that plan was not furnished to or called to the attention of potential bidders.
 
 
 136
 If, nevertheless, a prospective bidder for the Eureka shares by some chance had looked at the court's files in the MSO receivership suit, he would not have found the necessary information as to Eureka's and Turman's financial condition, assets and earnings.
 
 
 137
 But these data were in Glass' hands and were furnished by him to the reorganization committee. In their brief on this appeal, Glass' counsel say: 'On April 23, 1928, the inventory of all the physical properties were completed' but 'Mr. Glass did not place these seven enormous volumes * * * into the court files.' They also say: 'Valuation data were freely made available to the reorganization committee and its counsel by Mr. Glass.'
 
 
 138
 As to Glass' argument that, in 1929, it was not the practice to put such data in the court's files: (1) It is discussed infra (in point 13 of this opinion); (2) that argument is irrelevant in connection with the lack of information accorded to a prospective bidder for the Eureka stock.
 
 
 139
 My colleagues say that a prospective bidder 'obviously * * * would be someone already acquainted with the Seminole field,' and that such a person or groups of persons would surely have kept a watch and been eager to snap up the Eureka shares, so that no loss could have resulted either from Glass' failure diligently to seek or stir up bidders for those shares or from the lack of adequate information in the court files.
 
 
 140
 That suggestion is most dubious. It is a matter of general knowledge that oil properties in the 1920's were bought by persons or groups-- bankers or wealthy persons in other businesses-- not themselves acquainted with such properties, and that, if they heard of a good 'buy,' they consulted oil experts.[50] Such persons, if sufficiently informed, might well have bid for the Eureka shares.
 
 
 141
 Moreover, if I am correct in concluding that Glass had the burden of proof, then it will not do to say, as my colleagues do, that we must assume (absent proof to the contrary) that no informed outsiders would possibly have become bidders, competing with the reorganization committee.
 
 
 142
 13. Judge Smith found, correctly, that the judicial sale of the UOP unpledged assets was chilled.
 
 
 143
 UOP had unpledged assets consisting chiefly of a claim against MSO. As UOP had almost no creditors other than the UOP bonds, those bonds, for their large deficiency (for principal and unpaid interest, remaining after the receipt of the proceeds of the sale of the Eureka stock) were entitled to almost all the proceeds of the sale of those unpledged assets.
 
 
 144
 The court, by its decree of November 22, 1929, ordered the sale of those unpledged assets on December 16, 1929. Article Sixth of that particular decree provided: 'The receivers shall, not less than ten days prior to the date fixed for sale under this decree, file with the Clerk of the Court a statement 'showing and describing as definitely as practicable[51] and made up to the latest day reasonably practicable, but in general terms:
 
 
 145
 '(1) All of the assets of each of the Holding Companies,[52] and all of the assets which shall have been acquired by the Holding Companies Receivers in the operation of its business and shall then be held by them; (2) All existing liens and charges created by pledge or deposit of assets of the Holding Companies or any of them as security, specifying the assets which are subject to such liens or charges, the Holding Companies, owning such assets and the amounts of such indebtedness, respectively; (3) All claims for federal and states taxes, interest and penalties then unpaid by or pending against the Holding Companies, respectively; (4) The amount of all indebtedness and liabilities of the Holding Companies Receivers, respectively, remaining unpaid; and all executory contracts which shall have been entered into, assumed or adopted by the Holding Companies Receivers in the operation of the business of the Holding Companies, respectively, or in the performance of their duties as such receivers; (5) All executory contracts to which the Holding Companies or any of them may be parties.'
 
 
 146
 The receivers did, on December 6, 1929, file statements with the Clerk, each of which was captioned, 'Statement filed by Joseph P. Tumulty and Joseph Glass, Receivers, pursuant to Article Sixth of Decree * * * dated November 22, 1929.'[53] Did those statements comply with that direction, i.e., did they describe 'as definitely as practicable,' but 'in general terms,' the assets and liabilities? Judge Smith explicitly found that they did not, that those statements-- intended to give adequate information to prospective bidders-- were decidedly uninformative, 'inadequate to enable a prospective bidder to formulate an intelligent bid.' Indeed, he goes so far as to find that they were 'misleading' and that 'certainly the tendency of the' statements 'would be to chill the sale.'
 
 
 147
 My colleagues stress the fact that, at the end of each filed statement was a sentence reading, 'Further information with respect to the foregoing may be obtained upon request at the offices of the receivers.' My colleagues go on to comment on the inadequacy of those filed statements, saying that it is 'inconceivable' that anyone seriously interested in the property, upon reading that sentence, would not have made further inquiry of the receivers. But would such an interested person have thought it possible that, if he had inquired of the receivers, he would learn of facts flatly contradicting what the public filed statements declared, e.g., that he would find that, instead of an 'undetermined tax liability' (as described in the receivers' statement), that liability not only had been reduced but would be wiped out, and that substantial refunds would be made (a fact known by Glass before the statements were filed)? Would he have thought that the most vital information would be omitted from the statements filed, and that he must procure that information by going to the offices of the receiver within the few-- ten-- days elapsing between the filing of the statement (December 6) and the sale (December 16)? The very shortness of time made it imperative that the publicly filed statements should contain all the vital data.
 
 
 148
 In our former opinion, 154 F.2d 978 at page 995, we said that a prospective bidder would naturally assume that the major facts were disclosed in the statements filed, and that any additional information-- obtainable by 'request' made to the receivers-- would be 'relatively unimportant, marginal.' I see no reason for abandoning what we then said. It is noteworthy that (as Judge Smith said) full disclosure of all these data had been made to the several committees, including the reorganization committee, many months before the latter committee arrived at the prices to be paid at the sale. Why should it have been made more difficult for a prospective competitive bidder to obtain these data? The answer, I think, is that Glass had a self-interest to serve in chilling the bidding. Again, it is important that this self-interest imposed on him the burden of proof.
 
 
 149
 It was a major defect in the filed statements that they left in utter obscurity the amount owing from MSO to UOP. No purchaser, even within the ten days, could have ascertained that amount by asking the receivers. For it was not until December 14, 1929-- or two days before the sale-- that, by an order of that date, the court even tentatively determined that amount.
 
 
 150
 My colleagues disagree with Judge Smith who said that, even if potential buyers went to the receivers' office, 'No intelligent bid could * * * be made' from the date there available, and that, 'Without the benefit of advice on expected recoveries, available to the committees by constant consultation with Glass and his accountant Lind, for any outsiders to have bid would have been impossible.' Judge Smith also found: 'No matter how much time was afforded, it was practically impossible for a bidder to evaluate the intercorporate claims which constituted a fairly large part of the assets without intimate knowledge of their history dug up by the receivers and their accountants in the five years before the sales.' (124 F.Supp. 788, 789.)
 
 
 151
 Judge Smith's statement was unquestionably right: The receivers, in their petition which led to the court's order of December 14, 1929, referred to nine volumes of supporting data, showing the details of these accounts, based on reports of experts for which the receivers had paid thousands of dollars. These reports, made in July 1928, and the nine volumes, the receivers had shown, long before December 14, 1929, to the committees. The receivers, however, never filed any of these data as part of the public court records, but removed them to the receivers' offices. Glass protests that they were 'filed.' But the 'filing' of a paper means that 'it shall remain with the Clerk to be inspected by those who have an interest in it'; the word 'filing' carries 'with it the idea of permanent preservation of the thing so delivered and received; that it may become a part of the public record.'[54] Glass argues that, in 1929, it was not the practice to make such data part of the public court record in receivership cases. But in 1917, James Byrne, a leader of the 'reorganization bar,' writing of receiverships, said: 'It is of the highest importance that at the very earliest moment there should be in the files of the court, for its guidance and that of all parties in interest, as full and clear a report of what the Court has in its hands for administration' as the receivers can prepare. 'The report should tell what the assets and liabilities of the company are. * * *' The court sometimes authorizes the receivers to hire experts to aid them in the preparation of such reports.'[55] So the court did here, but the receivers did not put the reports in 'the files of the court.'
 
 
 152
 The receivers' December 9, 1929 petition, stated: 'Your petitioners believe that there will be no opposition to' the proposed order 'on the part of any of the parties interested, in view of the fact that the only imaginable source of information in opposition to any of these claims would be the very records from which this data (sic) has been derived.' Here the receivers recognized how unenlightening the petition and the December 16, 1929 order were, in the absence of the data they did not put of record. Indeed, the receivers, in their report made in 1928, had said that such data were essential to an informed judgment.
 
 
 153
 The only 'parties interested' to whom the receivers gave notice of the December 9, 1929 petition, were those who had entered formal appearances in the receivership proceedings and the several committees. No notice was published.
 
 
 154
 The petition prayed, and the order provided, that the intercorporate claims as tentatively adjusted should be 'subject to readjustment by further order of the court from time to time upon further showing' of the receivers 'but not otherwise.' In fact, on May 8, 1930, after confirmation of the sales, the court, on the receivers' petition further tentatively readjusted the claims in an order again providing for 'further readjustment by further order, from time to time upon further showing of the receivers, but not otherwise.'
 
 
 155
 My colleagues concede that this method of handing the intercorporate claims was most unsatisfactory. But they say that this method was necessitated by the court's demand for a speedy reorganization. (Judge Smith and my colleagues suggest that a prompt reorganization was essential because the receivership expenses, if continued, would consume the assets. This, however, seems highly doubtful with respect to Eureka; and it emphasizes the desirability of a separate reorganization of UOP.) However, there is much evidence to indicate that the judicial pressure derived from Glass' belief, and consequent advice to the court, that such speed was desirable: On October 27, 1927, many months before the court began to exert any pressure, Glass had written a letter deploring delay in reorganization because of the receivership expenses, and saying he wanted 'to be relieved of the burdens of the receivership at the earliest possible moment.' Some four months before the decrees of sale, Glass, in his letter of July 29, 1929, incorporated in the published reorganization plan, said he saw 'every reason for the prompt consummation of reorganization.' The court's pressure was not at all unwelcome to Glass. He never urged that it was undesirable. He thoroughly approved it. In a letter dated October 31, 1929, answering a securityholder who inquired about the reorganization, he said he felt it to the 'best interests' of everyone 'to have the receivership lifted at the earliest possible moment,' that the 'receivership can be lifted in about sixty days if the Plan goes through,' that the receivers were 'anxious to get through' with the receivership, and believed that 'the sooner the matter is cleaned up the better it will be for all parties concerned.' These were not the sentiments of a man who recognized that haste would lead to the unsatisfactory disposition of important matters and who reluctantly submitted to the court's request for haste. The sloppy job with reference to the intercorporate claims cannot, then, be ascribed to the court's demands.
 
 
 156
 Nor can judicial pressure-- which, according to Glass, commenced early in 1929-- explain why the so-called adjustment was made only two days before the sale: In their third report, filed on May 27, 1928, the receivers had said that 'balance sheets for all companies are now in process of completion, which balancesheets will show in detail the intercompany claim situation'; that engineers were at work 'completing their appraisals';[56] that 'the valuations thus arrived at will be used as the basis for proper book entries as of January 1, 1928'; that 'balance sheets have been tentatively prepared with blanks left for the insertion of these figures derived from those valuations,' and 'in these balance-sheets tentative treatment will be given to intercorporate accounts.' The receivers added: 'It is the purpose of the receivers thereafter to present recommendations to the court for the disposition, without litigation, of these intercorporate accounts upon notice to all interested parties. * * * Fortunately, the end is in sight. The complications which remain are few in number.' This was about one and a half years before the receivers filed their petition on which the court based its order of December 14, 1929.
 
 
 157
 And why, at the very latest, could not the tentative 'adjustment' have been made soon after the plan's publication on July 29, 1929?
 
 
 158
 The time-table of events is revelatory:
Receivers' Third Report ............... May 27, 1928
Reorganization plan published ......... July 29, 1929
Decree of sale of unpledged assets .... Nov. 22, 1929
Notice of this sale ................... Nov. 26, 1929
Receivers' Statements filed with the
 Clerk ................................ Dec. 6, 1929
Order tentatively adjusting
 intercorporate claims ................ Dec. 14, 1929
Sale of Unpledged Assets .............. Dec. 16, 1929
Confirmation Order .................... Dec. 24, 1929
 
 
 159
 But even if we ascribe the unsatisfactory and tardy method of tentatively adjusting these claims to judicial pressure for speed, it is difficult to comprehend why the UOP claims against MSO which (as my colleagues say) had been 'liquidated,' by the order of December 14, 1929, at $1,370,000, should have been valued by the reorganization committee and Glass at some $300,000, and why they fixed its sale price at some $200,000. My colleagues say of these low figures, 'We do not know how they were reached, nor is it necessary that we should; they stand unless they are shown to be incorrect and they have not been.' If, however, Glass had the burden of proof, then it was necessary for him to show how these figures were reached and that they were correct and fair.
 
 
 160
 If UOP had been separately reorganized, its claim against MSO would not have been sold but enforced:
 
 
 161
 I recur to the fact that no one has explained why UOP was not separately reorganized. Had it been, the new (reorganized) UOP would have been in a position to assert against MSO its creditor claim which (according to the receivers) amounted to at least $1,730,000. In such circumstances, that claim would not have been sold at a judicial sale but would have been litigated or settled-- and not on the basis of a mere guess that it was worth only $300,000.
 
 
 162
 Because of Glass' non-disclosure of his personal interests, he may be required to repay part of the compensation paid him as receiver of UOP:
 
 
 163
 Since Glass did not, before confirmation of the sales, disclose to the judge his personal interests, and because the judge acted on Glass' tainted advice, Glass may be required to repay part of the compensation paid him as receiver.[57]
 
 14. Boyd-case rule violation
 
 164
 My discussion thus far has dealt with those aspects of the case unrelated to the doctrine of Northern Pacific v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931, I now turn to that doctrine. I think that it was violated here, and that therefore Glass is liable because (aside from the reasons I have previously canvassed) he aided that violation and, in so doing, was guilty of disloyalty to the UOP bondholders, since he was serving his personal interests.
 
 
 165
 In our former opinion, 154 F.2d 978, at page 999, we said: 'The Boyd case principle was violated if stockholders or creditors of Middle States, without adequate new consideration, received under the plan a participation in United assets and if United bondholders were not offered in the plan the equivalent of payment in full, since even the creditors of Middle States were not creditors of United but creditors of a stockholder of United.' Significant here is the fact that (as previously observed) contrary to then well-established practice, the reorganization committee did not submit the plan to the court, and the court, before confirming the sales, refrained from holding, pursuant to notice, a hearing on, and then passing on, the fairness of the plan.
 
 
 166
 Unquestionably (as shown infra) the plan, in several important respects, disturbed the position of the UOP bonds with reference to Eureka and the unpledged UOP assets, and allowed MSO stockholders and its creditors to participate in the new company, in such a manner that they were benefited by the new company's ownership of these UOP assets.[58] Glass testified that in November 1929 'there was no equity in the MSO Corporation-- no residuum of equity available for stockholders.' Judge Smith found that it was then insolvent and that 'the old M.S.O. stockholders as such did not provide any new consideration.'
 
 
 167
 Judge Smith said that the fact that assets were provided by others did not make the Boyd rule inapplicable so far as the MSO stockholders were concerned.[59] I shall, however, assume, arguendo, that this conclusion would not necessarily be correct, if (1) a 'system' reorganization were essential, and (2) the contributed assets had a worth sufficient to give the UOP bondholders the equivalent of their displaced rights.
 
 
 168
 However, the 'equivalent' doctrine-- permitting stockholders to participate, despite displacement of senior creditor rights, if the reorganization plan provides an equivalent for those displaced rights-- does not apply unless the participation of stockholders in the reorganization is essential. See, e.g., Kansas City Terminal Company v. Central Union Trust Co., 271 U.S. 445, 46 S.Ct. 549, 552, 70 L.Ed. 1028: 'Generally, additional funds will be essential to the success of the undertaking, and it may be impossible to obtain them, unless stockholders are permitted to contribute and retain an interest sufficiently valuable to move them. In such or similar cases the chancellor may exercise an informed discretion concerning the practical adjustment of the several rights.'[60] In Consolidated Rock Products Company v. Du Bois, 312 U.S. 510, 529, 61 S.Ct. 675, 85 L.Ed. 982, the court held that the 'absolute priority' rule precludes participation by stockholders unless there is 'a necessity of seeking new money from them' (or new assets). But there (as I think I have shown above) so far as UOP was concerned, a 'system' or 'merger' reorganization was not essential, i.e., UOP could easily have been separately reorganized and such a separate reorganization would have been better for the UOP bonds. Therefore displacement of their rights was not justified: Surely, when insolvent Company A could be reorganized by itself, and so reorganized, could easily obtain all needed additional funds, it is not lawful to merge it with insolvent Company B under a reorganization plan which cuts off some of the substantial 'absolute priority' rights of Company A's creditors, and gives those rights to its stockholders, merely because Company A's creditors receive an equivalent of their reduced rights in the form of securities of the new company resulting from the merger. It does not concern us here whether a different rule would govern were one of the companies a railroad or public utility; see First National Bank v. Flershem, 290 U.S. 504, 54 S.Ct. 298.
 
 
 169
 However, in the balance of this Boydrule discussion, I shall generally assume, arguendo, that a 'system' reorganization was essential. On that assumption, in order to make the plan fair to the UOP bondholders, it was necessary that the new company have assets, theretofore not available to the UOP bonds, of sufficient value to make up for the rights of which the UOP bonds were deprived.
 
 
 170
 The plan did displace the rights of the UOP bonds as follows:
 
 
 171
 (1) The new bonds allotted to them bore interest at 6 1/2%. The old bonds carried interest at 8% plus 'interest participation' not exceeding 20 1/4%. The new bonds were thus 'an inferior grade of securities.'[61]
 
 
 172
 (2) The old bonds matured by their terms on July 25, 1931. The new bonds matured on January 1, 1945. Again this made the new bonds 'inferior.'[62]
 
 
 173
 (3) For the purpose of allotting new securities, the UOP bonds were entitled to their principal plus accrued interest, to the effective date of the plan, or about $4,450,000. Instead, the plan computed interest at but 8% up to July 29, 1929, making a total, for principal and interest, of but (about) $3,350,000.
 
 
 174
 (4) The UOP bonds, being entitled to virtually all the UOP assets, were in a position, on a reorganization of UOP, to obtain voting control. Under the plan, they received far less than a majority of the new company's Class A stock and none of the Class B stock.[63] But stockholders and other creditors of MSO (stockholders and creditors of the stockholders of UOP) received a majority of the Class A stock and the overwhelming majority of the Class B stock, thus putting ultimate voting control in their hands.[64]
 
 
 175
 Did the plan contain a 'full compensatory provision * * * for the entire bundle of rights'[65] of which the UOP bonds were deprived'? It is suggested that this requirement does not apply where, as here, a reorganization involves a 'merger.' I do not degree.[66] A reorganization which violates the Boyd doctrine is a fraudulent conveyance; and clearly a fraudulent conveyance can result from a merger.
 
 
 176
 My colleagues suggest that this reorganization was so complex that, to determine whether the Boyd doctrine was violated, is an horrendous achievement. However, if I am correct in concluding that Glass had the burden of proof, then it would have been up to him to show that, in displacing the previous rights of the UOP bondholders, enough was supplied by way of substitution for the displacement of the UOP bond rights.
 
 
 177
 It may well be, as my colleagues say, that, if Glass had had no personal interest in achieving the reorganization then, as he was merely a 'meddling outsider,' the bondholders could assert a claim against him for any conduct which fell foul of the Boyd doctrine, only to the extent that they could prove an actual, specific, resultant loss. But, once more, this ruling tumbles if Glass had the burden of proof.
 
 
 178
 Here again enters the question, discussed above, of the fair going-concern value of Eureka. For that a fair price was paid at the forced sale of Eureka does not answer the Boyd-case question: The unfairness of the offer in a plan is not cured simply because the alternative is a proper share of the price paid at such a sale. Both alternatives must be fair.
 
 
 179
 So, too, as to fair going-concern value of the unpledged UOP assets. Judge Smith says that, at the forced sale, the UOP claim against MSO was sold at 'a fair price,' (i.e., $200,000). But again, even were that price fair, that fact would not meet the Boyd problem. The receivers, as we have seen, obtained an order on December 14, 1929, 'liquidating' that claim at $1,730,000. True, they 'valued' it, before the sale, at $300,000. But, as my colleagues concede, that 'valuation' was pure guesswork. Since Glass had the burden, it was up to him to prove that it was not worth at least $1,730,000.
 
 
 180
 Judge Smith seeks to get rid of the question of the fair value of that claim by saying that 'any claim under the Boyd Rule as to that debt is washed out on its acquisition by Middle States Petroleum' (i.e., the new company). Not at all-- unless the new securities allotted to the UOP bondholders gave them the equivalent of their rights in the UOP assets.[67]
 
 
 181
 In this connection, my colleagues once more employ the 'judicial pressure' argument to justify the $300,000 valuation fixed by the reorganization committee and Glass. But, assuming, arguendo, the cogency of that argument with respect to the fairness of the price paid at the judicial sale, it cannot excuse the use of that figure for purposes of ascertaining the fairness of the plan. Judge Smith, speaking of the plan's provisions as they affected another interest (Southern States), said that 'Some plan undoubtedly could have been worked out which would have adjusted the accounts between the corporations' (as of the date of the adoption of the reorganization plan) 'and provided additional' securities to be issued later when the accounts were finally adjusted.[68] The same is true as to the UOP claim against MSO: The plan, to be fair, should have provided that securities were being reserved for issuance to the UOP bonds, if, upon subsequent examination, the value of that claim should turn out to exceed $300,000. Such a provision would, in a simple way, have obviated the unfairness created by the pressure for speed.
 
 
 182
 Here it should again be noted that, as Judge Smith said, Glass and the reorganizers 'probably * * * desired to effect a reorganization to be controlled by the interests represented on the reorganization committee.'[69]
 
 
 183
 Unfairness in cancelling the option to deposit at a time when a non-depositing bondholder could not know the amount of cash distributable to him if he failed to deposit:
 
 
 184
 Judge Smith found: 'The receivers made no affirmative effort to inform non-depositing United bondholders of facts upon which the bondholders could determine for themselves whether acceptance of securities under the plan or cash distributive values would be in the bondholders' best interests.' Nor could any such bondholder so determine until he knew the amount of cash he would receive if he failed to deposit under the plan. And this he could not know until, in 1933, the court fixed it at about $698 per $1000 bond (face amount). Meanwhile, on May 14, 1930, the right to deposit was cut off. In these unusual circumstances, that cut-off was most unfair. The situation was unusual-- and thus unlike Jameson v. Guaranty Trust Company, 7 cir., 20 F.2d 808, 815, cited by Judge Smith and my colleagues-- because, in the usual case, the securityholders know, before the cut-off, exactly the amount of cash they will receive if they elect not to deposit.
 
 
 185
 Here the non-depositors had no such knowledge until July 25, 1933, when their distributive share of cash was fixed at about $698 per each $1000 bond (face amount). That distributive share bore no interest from the date of the sales' confirmation to July 25, 1933. On September 12, 1930, Glass, as president of the new company, reported that it had made 'a very considerable saving' as a result of the cut-off. He was then still a receiver of UOP.
 
 
 186
 Accordingly, all else aside, the plan was unfair because there was not in it a 'tender made and kept good'[70] of new securities to the UOP bondholders. (It is interesting that the Class B shares, allotted to the old MSO stockholders, apparently had a market value of some $10,000,000 in September 1952.) I think that Glass, who served his own personal interests in helping to consummate the plan, is liable for any resulting loss to UOP bondholders who did not deposit during the period from the end of 1929 to July 25, 1933. 'What constitutes a fair opportunity of participation may depend on the circumstances. A fair time limit may be set, but otherwise a bondholder cannot be excluded unless he is informed of all relevant facts.'[71]
 
 
 187
 I cannot agree with my colleagues that those bondholders have no cause for complaint because they did not ask for an extension of the offer beyond May 14, 1930: It was not up to them to see that the plan made them a fair offer.
 
 
 188
 My colleagues say that bondholders who 'were delaying their choice until the distribution dividend was fixed, should have communicated with the committee or the receivers,' and therefore 'are in no position to complain' if they were cut off without so communicating. The short answer is that the committee and the receivers could not have told anyone, in May 1930, what the 'distribution dividend' would be in July 1933.
 
 
 189
 My colleagues also say: 'Judge Knox had decided that the receivership, already six years old, must be ended; and if MSP (the new company) was to have a start unhampered by the past, it was essential that it should know how many of the old bonds would be refunded and how many it must pay off in cash. That could not be known until the options had expired; and not until then could Judge Knox' decision be put into effect.' This assertion rests on a fallacy: Judge Knox merely directed that the assets be taken out of the receivership. He did not concern himself with the adventures of the new company, once the sales to it (via the reorganization committee) had been confirmed. In fact, he held that, after confirmation, he had no jurisdiction re the new company's affairs. And, note again, he did not, after notice and hearing, determine the fairness of the offers in the plan to non-depositors.
 
 
 190
 Glass, at the time of the cut-off, was still UOP receiver and was also the new company's president. Before becoming president of the new company, he had (so Judge Smith found) 'an understanding with the company that, in any case in which the company's interest conflicted with his position as receiver, he would act as receiver and not for the company.' Here he signally failed: As UOP receiver, he assured non-depositors of the plan's fairness. He therefore had the duty to see that the plan's offer was fair, i.e., kept open until a non-depositing bondholder could know the alternative to accepting the offer. But, as already noted, Glass, the new company's president, had a conflicting interest, i.e., to terminate the offer before such knowledge was possible. The cut-off in 1930 favored that conflicting interest.
 
 
 191
 As reflecting his attitude, it is relevant that, after Glass became president of the new company while still remaining receiver, he favored the interests of that company, or his own direct interests, opposed to those of minorities interested in receiverships other than UOP. Thus Judge Smith found that Glass and his family purchased stock in the new company without disclosing that fact to the court; that, as receiver, he sold securities or claims to the new company, without the court's approval; and that, as receiver, he caused receivership companies to make large loans to the new company, without court orders.
 
 
 192
 15. Summary of disadvantages to UOP bondholders of a 'system' reorganization.
 
 
 193
 If, in place of a 'system' reorganization, the UOP bondholders had, through judicial sales of the UOP assets, acquired all those assets, they would not have suffered these serious disadvantages:
 
 
 194
 (1) There would have been no price for any of those assets tailored to a 'system' reorganization.
 
 
 195
 (2) There would have been no excuse of haste to support a sale of the huge claim of UOP against MSO. By litigation (or settlement of threatened litigation) of that claim, they might well have collected substantially more than the $200,000 for which that claim was sold in circumstances which made an intelligent 'outside' bid impossible.
 
 
 196
 (3) They would have obtained undiluted ownership and management of Eureka and would not have been asked to accept any displacement of their rights and to receive 'inferior' securities as the equivalent of such displaced rights, securities, whose value it was most difficult to evaluate.
 
 
 197
 16. MSP (the new company) and the fraudulent conveyance.
 
 
 198
 In the usual Boyd case situation, the attack is on the old stockholders as grantees of a fraudulent conveyance. Where there are innocent investors in the new company, and many of the old stockholders have sold their new securities, the courts usually require the new company to issue, to the none-assenting bondholders, new securities, which will not work harm to the innocent investors. But the old stockholders, nevertheless, are the fraudulent grantees. My colleagues say correctly that the grantee in a fraudulent conveyance is immune, unless the grantor had an actual 'intent to defraud,' if any fair consideration passed to the grantor.[72] I have much doubt whether here the consideration came within that category.
 
 
 199
 There still remains the question of the statute of limitations or laches. The 'fraudulent conveyances' here were accomplished through sales by a special master appointed by a federal court. It would seem that, as this involved the integrity of the federal judicial process, the New York Statute of Limitations, and the New York laches doctrine, would not apply. My colleagues say, however, that, since appellants did not appeal from the order confirming the sales, no federal question in involved in their collateral attack on the sales as fraudulent conveyances. I have much doubt on that score. For when a fraudulent conveyance, achieved through a judgment, is attacked, after the time for an appeal from the judgment has elapsed, the attack, although collateral, is on the judgment. However, although with grave misgivings, I concur in my colleagues' conclusion that no order against MSP should be entered.
 
 
 200
 17. No laches. Cohen and appellants not chargeable with knowledge privately possessed by the UOP bondholders' committee or the reorganization committee.
 
 
 201
 No one suggests that Cohen Knew, or reasonably should have known, of Glass' personal interests adverse to those of the UOP bondholders, or had been advised as to the date concerning valuations and other important matters not put of record in the receivership. Judge Smith has found that Cohen was not so informed that appellants are barred by laches. My colleagues do not question that finding; and they agree, on the bases of our conclusion in our earlier opinion, 154 F.2d 978, at pages 1000-1001, that, if Glass, as federal court receiver, violated his loyalty-duty, no state statute of limitation would bar the claim against him.
 
 
 202
 Glass still seems to urge, however, that because Cohen deposited some of his UOP bonds under the plan, he and his representatives, vis a vis the bonds he did not deposit, must be charged with knowledge of facts he did not know but which were known to the UOP bondholders' committee. We answered such an argument, as follows, in our former opinion, 154 F.2d 978, at pages 996, 998: 'In other words, appellees' position, in effect, seems to be that the receiver discharged their fiduciary duty, owing to all United bondholders, when they made full disclosure to the committee representing those who deposited. Of course, that is not true. The receivers represented all non-depositing as well as depositing claimants, but the committee did not. Fully to inform non-depositors was as much the duty of the receivers as to inform the committee. The very fact that no committee represented non-depositing United bondholders imposed on the receivers an obligation to keep them fully informed, to make essential information as easily accessible to them as was practicable. Appellees, however, contend that all information obtained by the committee representing deposited United bonds must be imputed to Cohen. We here assume (without indicating a possible qualification) that Cohen, in his capacity as a holder of deposited United bonds, and with respect to such bonds, must be treated as having had such knowledge 'constructively.' But, absent any proof that actually (not merely 'constructively') Cohen had such knowledge, we do not agree that it is to be imputed to him in his capacity as a holder of the non-deposited bonds, or to the person or persons who previously held those bonds. * * * Since appellants seek no relief with respect to the United bonds which Cohen exchanged for new securities under the plan, we need not consider whether that exchange would have barred appellants had they sought, with respect to those bonds, to surcharge the receivers. But we cannot agree that that exchange of those bonds prevents appellants, as successors of Cohen with respect to the unexchanged bonds, from thus seeking to surcharge. As to those bonds, Cohen was in no different position from any other holder of undeposited bonds. There is nothing to show that he had better information than any other such holder; and no such holder, unless (unlike Cohen) he received special advice from the receivers or the committees, was informed of the data in the hands of the receivers * * *. The record does not support the statement of the district judge[73] that Cohen 'had full knowledge of what was done with respect to the assets' of United and 'also had complete appreciation of the significance there,' if the judge meant that Cohen was informed of the values and accounting.'[74]
 
 
 203
 Moreover, even if appellants were barred by laches, Glass should be surcharged for the benefit of all other holders of undeposited UOP bonds. For, as we said in our former opinion, 154 F.2d 978, at page 992, note 13: 'The surcharging is not limited to an amount measured by the interest of the particular person thus objecting to the receiver's accounting, since the surcharge is for the benefit of all similarly situated persons. For the court, in administering the estate in its custody for all the beneficiaries, must see to it that none of them suffers because of the misconduct of its receiver, and the discharge of that obligation should not depend upon their appearance in court to voice their objections to that misconduct. Cf. Moon v. Wineman, 57 Minn. 415, 59 N.W. 494, 495. Thus, if the judge learned of the misconduct from a wholly neutral source (cf. Investment Registry v. Chicago & M. Electric Ry. Co., 212 F. 594, at page 608), he should surcharge the receiver and distribute among all interested the money owing to the estate by the receiver because of that misconduct.' We also said, 154 F.2d 978, at page 1002: 'Appellants have the right, for their own benefit and that of other holders of non-deposited bonds to have Glass surcharged on account of his wrongdoing, if any. In so holding, we do not mean that, even if appellants lacked that right, the district court should have disregarded the merits of appellants' charges against Glass and should have refrained from directing an investigation for the benefit of whatever persons may have been injured by Glass' alleged misconduct.'
 
 
 204
 18. Glass' major derelictions summarized.
 
 
 205
 Here is a summary of Glass' major derelictions:
 
 
 206
 (1) He urged and helped to consummate a 'system' reorganization, to his own benefit, and did not propose a separate UOP reorganization which would have been far more beneficial to the UOP bondholders.
 
 
 207
 (2) He had a personal interest in fees, payments of which depended on the sales in aid of the 'system' reorganization, but he did not disclose that interest to the judge until after confirmation of the sales.
 
 
 208
 (3) He had a personal interest in becoming lawyer for the new company which would result from the 'system' reorganization, but he did not disclose that interest to the judge.
 
 
 209
 (4) By repeated assurances to all securityholders, he virtually underwrote the fairness of the plan and, alternatively, the price paid for the Eureka stock, but he did not discharge his duty of diligently seeking purchasers for that stock.
 
 
 210
 (5) He agreed to prices tailored to the 'system' reorganization.
 
 
 211
 (6) He deviated from the normal practice of putting in the permanent public court record important data (which he privately made available to the committees).
 
 
 212
 (7) He acquiesced in the departure from the standard practice of having a court hearing, on notice to all interested persons, concerning the plan's fairness.
 
 
 213
 (8) As UOP receiver, he owed a duty to keep alive the offer to non-assenting bondholders until they could learn the amount of cash they would receive if they did not deposit; instead, he yielded, as the president of the new company, to the conflicting interest of that company which gained by the cut-off of the offer before the bondholders could learn that amount.
 
 
 214
 (9) He delayed, without explanation, for many years in filing his final account, with the consequence that witnesses died and documents were lost; in the interval, he resisted efforts of interested persons to obtain vital information about the receivership, which he had not put in the court files.
 
 
 215
 All this does not add up to 'innocence.' These derelictions would have been bad enough if Glass had been a layman. They were worse because he was a lawyer, with the obligations which our profession exacts of its members.[75]
 
 
 216
 In more concrete terms, the salient features of the story are as follows: Glass, originally a lawyer representing stockholders of UOP, becomes its receiver and is handsomely rewarded for that service.[76] Having a continued, personal interest in the welfare of the stockholders, because of unpaid fees owing to him from them, he promotes, and helps to put through, a reorganization. This reorganization favors the stockholders and injures the holders of undeposited UOP bonds. It involves the creation of a new company in which UOP's valuable assets are not only merged but submerged, a company for which, before the judicial sales-- essential to that reorganization-- he had been virtually assured he would be counsel. As a consequence of that reorganization, he receives fees (as counsel for the stockholders' committee) which could not otherwise have been paid. Before confirmation of the judicial sales, he does not disclose his personal interests to the Judge. A few weeks after confirmation of the sales, he becomes president of the new company at a splendid salary.[77] As president, and still UOP receiver, he soon favors the new company where its interests conflict with those of the holders of undeposited UOP bonds. Ever after, he remains UOP receiver and president of that company, and controls it.[78] He and his family buy and now own a highly valuable block of its outstanding securities.[79] All this he achieves by means which caused a serious loss to bondholders for whom he was obligated to act as a fiduciary. I think a federal to act as a fiduciary. I think a federal receiver may not thus misuse his position.
 
 On Petition for Rehearing
 
 217
 PER CURIAM.
 
 
 218
 The petition for rehearing and for correction of the opinions, majority and dissenting, filed February 7, 1955, is denied in all respects except as to the question of costs and disbursements on the appeal. The appellees may have until March 9th to file any objection they may wish to make to the denial of costs to all parties, and that each party shall bear its own disbursements, the cost of printing the 'Joint Appendix' to be borne, one half by the appellants and the other half by the appellees, in such proportions among themselves as they may agree.
 
 
 219
 On the Award of Appellate costs.
 
 
 220
 Before L. HAND and SWAN, Circuit Judges.
 
 
 221
 PER CURIAM.
 
 
 222
 On February 21, 1955, in our memorandum denying the appellants' petition for rehearing, we said that the appellees might have until March 9th to file any objections they might have to the denial of costs to all parties and that each party should bear its own disbursements, the cost of printing the 'Joint Appendix' to be borne one half by the appellants and the other half by the appellees. The attorney for Middle States Petroleum Corporation-- MSP-- filed an affidavit, and a reply thereto was filed by the attorney for the appellants. It now appears that Glass did not pay any part of the expense of printing the 'Joint Appendix,' but that MSP paid the whole amount. Our reason for not taxing the appellees' disbursements was because the court was not unanimous, which showed that the appeal was not unjustified. However, the court was unanimous as to the dismissal of the claim against MSP, because of the bar of the Statute of Limitations; and we can therefore see no reason why the entire cost of printing the 'Joint Appendix' should not be borne by the appellants. There can be no question that this expense was necessary to a disposition of the appeal, and we are not disposed to regard the action as one brought in the public interest by Cohen's executors, Levy Brothers and Sophie Cohen, individually; only the U.O.P. bondholders had any interest in the outcome and a very small fraction of them.
 
 
 223
 The printing cost of the 'Joint Appendix' and 'Supplemental Record'-- $11,710.82-- will be assessed against the appellants. Otherwise no costs or disbursements will be awarded to any party.
 
 
 
 [1]
 Phelan v. Middle States Oil Corporation, 2 Cir., 203 F.2d 836
 
 
 [2]
 Phelan v. Middle States Oil Corporation, 2 Cir., 210 F.2d 360
 
 
 [3]
 Northern Pacific Railway Co. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931
 
 
 [4]
 United States v. National Association of Real Estate Boards, 339 U.S. 485, 495, 70 S.Ct. 711, 717, 94 L.Ed. 1007
 
 
 [5]
 § 170, Comment (c)
 
 
 [6]
 § 170.10
 
 
 [7]
 196 F.2d 668, 675
 
 
 [8]
 Crites, Inc., v. Prudential Co., 322 U.S. 408, 64 S.Ct. 1075, 88 L.Ed. 1356; Woods v. City National Bank & Trust Co., 312 U.S. 262, 263, 61 S.Ct. 493, 85 L.Ed. 820
 
 
 [9]
 Jackson v. Smith, 254 U.S. 586, 588, 41 S.Ct. 200, 201, 65 L.Ed. 418
 
 
 [10]
 Phelan v. Middle States Oil Corporation, 2 Cir., 154 F.2d 978, 991
 
 
 [11]
 Wildes v. Robinson, 50 App.Div. 192, 63 N.Y.S. 811; Beardsley v. Nieblo Manufacturing Co., 231 App.Div. 152, 246 N.Y.S. 641
 
 
 [12]
 Galveston, H. & S.A.R. Co. v. State of Texas, 210 U.S. 217, 226, 28 S.Ct. 638, 52 L.Ed. 1031; Consolidated Rock Products Co. v. Du Bois, 312 U.S. 510, 525, 526, 61 S.Ct. 675, 85 L.Ed. 982; Group of Institutional Investors v. Chicago, M., St. P. & P.R.Co., 318 U.S. 523, 540, 63 S.Ct. 727, 87 L.Ed. 959
 
 
 [13]
 Dudley v. Mealey, 2 Cir., 147 F.2d 268, 270
 
 
 [14]
 Geddes v. Anaconda Copper Mining Co., 254 U.S. 590, 602, 41 S.Ct. 209, 213, 65 L.Ed. 425
 
 
 [15]
 Berner v. Equitable Office Building Corp., 2 Cir., 175 F.2d 218, 220; Pallma v. Fox, 2 Cir., 182 F.2d 895, 900; Pappathanos v. Coakley, 263 Mass. 401, 161 N.E. 804; Campbell v. Campbell, 2 Cir., 8 F. 460; McManus v. Sawyer, 2 Cir., 231 F. 231; Daniels Chancery Pleading & Practice, p. #1225; Bates Federal Equity Pleading, Vol. II, § 763
 
 
 [16]
 Eastman Kodak Co. v. Southern Photo Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684; Story Parchment Paper Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544; Bigelow v. RKO Radio Pictures, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652
 
 
 [17]
 Northern Pacific R. Co. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931
 
 
 [18]
 Northern Pacific R. Co. v. Boyd, 228 U.S. 482, 508, 33 S.Ct. 554, 561, 57 L.Ed. 931
 
 
 [19]
 Phelan v. Middle States Oil Corporation, 2 Cir., 154 F.2d 978, 992, note 13
 
 
 [20]
 Adler v. Fenton, 24 How. 407, 413, 16 L.Ed. 696; Findlay v. McAllister, 113 U.S. 104, 111, 114, 5 S.Ct. 401, 28 L.Ed. 930
 
 
 [21]
 Glenn, Fraudulent Conveyances, § 56
 
 
 [22]
 Uniform Fraudulent Conveyances Act, § 4
 
 
 [1]
 I say 'primarily,' since (as will appear, infra) I think that, as to some important items, even if appellants had the burden of proof, they discharged it
 
 
 [2]
 The holders of the UOP bonds were entitled to receive semi-annual payments at the rate of 8% plus so-called 'interest participation' not exceeding 20 1/4% per annum
 The court, in its decree of November 15, 1929, stated that the overdue interest and 'interest participation' (together with interest thereon) then came to approximately $2,000,000.
 Omitting interest on interest, the figure was about $1,600,000.
 
 
 [3]
 Crites, Inc., v. Prudential Company, 322 U.S. 408, 64 S.Ct. 1075, 88 L.Ed. 1356; Woods v. City National Bank & Trust Company, 312 U.S. 262, 263, 61 S.Ct. 493, 85 L.Ed. 820
 
 
 [4]
 Jackson v. Smith, 254 U.S. 586, 588, 41 S.Ct. 200, 201, 65 L.Ed. 418
 
 
 [5]
 Crites, Inc., v. Prudential Company, supra
 
 
 [6]
 Ibid.; cf. Button v. Cities Fuel & Power Company, 4 Cir., 300 F. 280, 299, 301, certiorari denied 266 U.S. 619, 45 S.Ct. 99, 69 L.Ed. 471; Investment Registry v. Chicago & M.E.R. Co., 7 Cir., 212 F. 594
 
 
 [7]
 Crites, Inc., v. Prudential Company, supra; Woods v. City Bank, supra; Jackson v. Smith, supra; cf. as to trustees generally, President & Directors of Manhattan Company v. Kelby, 2 Cir., 147 F.2d 465, 476; Restatement of Trusts, § 170, comment c
 
 
 [8]
 Crites, Inc., v. Prudential Company, supra; cf. Pagburn v. American Vault, Safe & Lock Co., 205 Pa. 93, 54 A. 508, 510; Gutterson & Gould v. Lebanon Iron & Steel Co., 3 Cir., 151 F.2d 72, 76-77
 
 
 [9]
 Pangburn v. American Vault, Safe & Lock Company, supra; cf. Koontz v. Northern Bank, 16 Wall. 196, 202-203, 83 U.S. 196
 
 
 [10]
 Crites, Inc., v. Prudential Company, surpa
 
 
 [11]
 Woods v. City Bank, supra; Weil v. Neary, 278 U.S. 160, 173, 49 S.Ct. 144, 73 L.Ed. 243; Crites v. Prudential Company, supra; Jackson v. Smith, supra; Magruder v. Drury, 235 U.S. 106, 119, 120, 35 S.Ct. 77, 59 L.Ed. 151
 
 
 [12]
 In an early case, it was said that a receiver is 'the officer and representative of the court * * * and having in his character of receiver no personal interest but that arising out of his responsibility for the correct and faithful discharge of his duties.' Beverley v. Brooke, 4 Grat. 187, 208, 45 Va. 187
 
 
 [13]
 In a letter of October 27, 1927, Glass wrote that there were some of the companies in the 'system' whose 'only reason for being in receivership is the misfortune of having been connected with Middle States.'
 The 'misfortune' of the UOP bondholders was that, because UOP had been 'connected with Middle States,' Glass did not give consideration to a plan for reorganizing it separately, since he had a personal interest in a 'system' reorganization.
 
 
 [14]
 The firm ceased to be counsel for the receivers when Glass became a receiver. For these services, the firm received $67,500
 
 
 [15]
 Thus he and his firm received from the receivership $242,500-- aside from the fees paid for services to the MSO stockholders' committee and the share of Hamburg's fee
 
 
 [16]
 Appellants say such was the fee. The record indicates that it was $19,999.99 in cash and the 150 shares
 
 
 [17]
 One member of the reorganization committee was chairman of the MSO stockholders' committee which Glass had represented as lawyer in 1924
 
 
 [18]
 He testified that his firm 'had a potential interest in compensation for services we rendered to the stockholders' committee up to the time of our resignation' as counsel for that committee
 
 
 [19]
 This comment applies to Judge Smith's equivocal finding: 'Glass' firm, in lieu of separate fixing of fees for its services to the stockholders' committee in the early stages of the receivership prior to its appointment as one of counsel for the receivers, shared in the allowances to Moore, Hall, Swan & Cunningham, having first brought the arrangement to the attention of the court.'
 Note that Judge Smith did not find that, before confirmation of the sales, Glass brought to the attention of the court any claim by his firm for fees as counsel for the stockholders' committee.
 
 
 [20]
 Glass refers to the fact that, between 1926 and 1929, Hamburg had received interim allowances in addition to the $10,000 allowance made to him in 1926. The fact that Glass, in 1930, called the judge's attention to his 1926 letter, and to no intervening letter, goes to show that, when the judge made interim allowances to Hamburg between 1926 and 1930, Glass had not told him that his interest in Hamburg's fees then continued
 The record contains no evidence to support Judge Smith's finding that Glass had brought to the court's attention the arrangement with Hamburg 'prior to each application for allowance.' Indeed, Glass testified that he drew Judge Knox's attention to this arrangement 'upon the first application for an allowance' (i.e., in 1926) and that 'before any order was signed on his application for a final allowance' (after confirmation of the sales), 'I referred him to my original letter and reminded him of my interest in the matter.'
 
 
 [21]
 The court ordered confirmation on December 24, 1929
 
 
 [22]
 He so wrote in letters, dated October 27, 1927, in which he stated he thought that, fairly soon, a reorganization 'can be worked out.' In one reply, the writer said, 'I assume, of course, that your services in a legal way will be engaged by the new corporation.' In another reply, another writer said, 'You should be retained in a legal capacity, as the reorganized company would then have the benefit of your good judgment on legal matters and all questions of policy.'
 
 
 [23]
 Cf. Restatement of Trusts, Sec. 170, Comment e: 'If the trustee sells to a third person for the purpose of repurchasing the property from the third person, although at the time he has no understanding with the third person as to the repurchase, he commits a breach of trust, and if he subsequently reacquires the property, he can be compelled to hold it subject to the trust.'
 
 
 [24]
 I say 'perhaps,' because this particular 'system' reorganization, which Glass furthered, gave participation to MSO stockholders. See point 14 of this opinion, infra
 
 
 [25]
 In their report of May 7, 1928, the receivers also said that, during the latter part of 1929, they had commenced a 'policy' of buying oil acreage and continued, 'Up to the time when creditors were provided for, the receivers could not make any such purchases without possible detriment to creditors' interest. They, however, now feel that, when creditors have been fully provided for, they will best serve the interests of the stockholders by conservative purchases of well-chosen acreage in order to insure future production and income for these companies.'
 
 
 [26]
 Glass testified before Judge Smith that it was 'theoretically possible' for him to cause Turman (by a reduction of its capital stock) to declare a substantial dividend which could have been used to pay some of the UOP interest. He did not explain why it was not practically possible
 
 
 [27]
 None had been paid since 1924
 
 
 [28]
 Judge Smith said: 'Some of Glass' transactions may have been harmful to some of the receivership estates. * * * It may be * * * he was unconsciously influenced by a desire to benefit the group of receiverships as a whole' rather than to act solely 'for the benefit' of any one of them. 'That was a danger incurred by the Court in order to avoid the expense of some thirty-eight additional receiverships.' But Judge Smith added, 'If it did occur and cause damage' to a particular estate, 'some means must be found to rectify it.' (124 F.Supp. 779.)
 
 
 [29]
 In Mosser v. Darrow, 341 U.S. 267, 273-274, 71 S.Ct. 680, 683, the court said: 'It is argued, and the Court of Appeals appears to have been impressed by the argument, that this surcharge creates a very heavy liability upon a man who enjoyed no personal profit and must be condoned "so as not to strike terror into mankind acting for the benefit of others and not for their own." (In re Federal Facilities Realty Trust, 7 Cir.,) 184 F.2d 1, 8. Trustees are often obliged to make difficult business judgments, and the best that disinterested judgment can accomplish with foresight may be open to serious criticism by obstreperous creditors aided by hindsight. Courts are quite likely to protect trustees against heavy liabilities for disinterested mistakes in business judgment. But a trusteeship is serious business and is not to be undertaken lightly or so discharged. The most effective sanction for good administration is personal liability for the consequences of forbidden acts, and there are ways by which a trustee may effectively protect himself against personal liability.'
 
 
 [30]
 And probably also in point 4, supra
 
 
 [31]
 Cf., as to burden of proof, Restatement of Agency, Sec. 389 and Comment e, Sec. 390 and Comment f
 
 
 [32]
 See 1 Corinthians 13:11-12
 
 
 [33]
 See our earlier opinion, 154 F.2d 978, at page 990
 
 
 [34]
 The interim accountings, from 1924 until 1945, were meager and uninformative
 
 
 [35]
 We quoted from and applied the doctrine of that case in In re New York, N.H. & H.R. Co., 2 Cir., 147 F.2d 40, 49
 
 
 [36]
 6 Collier, Bankruptcy (12th ed. 1947) 41
 
 
 [37]
 See, e.g., Matter of Hubbell's Will, 302 N.Y. 246, 253, 97 N.E.2d 888; In re Trust Created By Will Of Enger, 225 Minn. 229, 239-241, 30 N.W.2d 694, 1 A.L.R.2d 1048, and cases there cited
 
 
 [38]
 On the hearing on confirmation of the sales, the counsel for the reorganization committee said he was submitting a proposed order of confirmation. The court asked, 'This includes the approval of the reorganization plan, does it not, or * * *' and was interrupted by counsel who said, 'The reorganization plan as such is not submitted to the court for its approval. * * *'
 
 
 [39]
 This practice was begun in the Frisco Railroad reorganization in 1916. See Swaine, The Cravath Firm (1948) II, 172
 
 
 [40]
 Ibid., 172, 184, 186
 
 
 [41]
 John Eiszener Company v. Wilson & Co., Inc., U.S. District Court, Southern District of New York, in Equity, No. E 30-119
 
 
 [42]
 In the reorganization receivership of J. Z. Horter Co. v. Punta Alegra Sugar Company, In Equity, No. E-54-44, pending in the court below in 1932, the court, (Judge Goddard) held a hearing, on notice to all interested persons, as to the fairness of the plan; then found the plan fair; and thereafter ordered and confirmed the sale
 
 
 [43]
 That it was so known to him, and that he did communicate it, appears from the following: A memo by Arkush, dated September 20, 1929, discusses the alternatives of submission of the plan for 'judicial approval' before, or at, or after, entry of final decree. At states, 'The most practical plan would be to submit Plan at time of decree or after decree and before sale, with notice of hearing on Plan, if required, to run concurrently with published notice of sale.'
 A memo of matters considered and decided at a meeting of counsel for the reorganization committee and Glass on September 23, 1929 (three days after the date of the Arkush memo) states that the draft of final decree was not to mention upset prices or the Plan and that the Plan was not to be submitted at that time.
 
 
 [44]
 Moody's Investors Manual, on which my colleagues otherwise rely, in its 1929 edition, after stating that Turman was owned by Eureka, a subsidiary of MSO, and that MSO was in a receivership, reported merely the following information concerning Turman:
 'Turman Oil Company: Incorporated in Delaware County 1917, to produce crude oil and natural gas. Company owns leases on 8,423 acres of which about 35% are producing in Mid-Continent oil fields, in Oklahoma and Kansas. Number of wells, 188. Production of oil in April 1927, 10,126 bbls. daily. Capital stock: Authorized $6,000,000; outstanding, $4,629,284; par $10 (changed from $1.00 May 25, 1923). Middle States Oil Corporation owns 82% of outstanding stock. Dividends paid at rate of 1% monthly from October 1921, to June 20, 1923, incl.; also 2% extra each July 20 and October 20, 1922; and 1% extra May 20, 1923. Dividend period changed to quarterly basis in April 1923, July 20, 1923, first quarterly dividend of 3% was paid; none thereafter to April 1, 1929. Daily production, 10,125 bbls. Minority Stockholders' Protective Committee: C. A. Holden, Tulsa, Okla., and J. S. Sheppard, New York, General Counsel.'
 Moody's 1930 edition contains no data re Turman.
 
 
 [45]
 See, e.g., Galveston, H. & S.A.R. Co. v. State of Texas, 210 U.S. 217, 226, 28 S.Ct. 638, 52 L.Ed. 1031; Consolidated Rock Products Co. v. Du Bois, 312 U.S. 510, 525-526, 61 S.Ct. 675, 85 L.Ed. 982; Dudley v. Mealey, 2 Cir., 147 F.2d 268, 270
 
 
 [46]
 This exhibit reads as follows: Earnings Per Share of Crude Oil Producers, 1929 Source: Moody's Manual of Investments, Industrial Securities, 1930 Edition
 Earnings Per Price Earnings
 Company Share 1929 1929 to Price
Barnsdall Corp...................... 3.19 20 15.95
Darby Petroleum Corp................ 1.13 6 1/2 17.38
Houston Oil Co. of Texas ........... 4.78 26 18.38
Independent Oil & Gas Co............ 4.26 17 3/4 24.00
Lion Oil Refining Co................ 4.39 18 24.38
Pacific Western Oil Corp............ 1.82 12 1/8 15.00
Simms Petroleum Co.................. 2.79 15 18.60
Skelly Oil Co....................... 5.28 28 18.86
Superior Oil Corp................... 1.06 5 1/4 20.19
 --------
 Average for Group--9 Companies ......................... 19.31
 
 
 [47]
 He testified, not that he or the reorganization committee had used these figures in 1929, but that he had used them, in preparing to testify before Judge Smith, in order to 'check retrospectively.'
 
 
 [48]
 If the average earnings for the five years 1925-1929 are used, then the deficiency on this basis is $594,000, computed as follows:
 (a) $374,000 (average annual
 income) at 10 ........... $3,740,000
(b) 82% (stock of Turman
 owned by Eureka) ......... 3,066,000
(c) 2/3 ........................ 2,044,000
(d) Actual price paid .......... 1,450,000
 ----------
(e) Deficiency ................ $ 594,000
 If the average earnings for the years 1926-1929 are used, but capitalized at 10 (as per Judge Smith), then the deficiency is $815,000, computed as follows:
 (a) $414,500 (average annual
 income) at 10 ........... $4,145,000
(b) 82% ........................ 3,398,000
(c) 2/3 ........................ 2,265,000
(d) Actual price paid .......... 1,450,000
 ----------
(e) Deficiency ................ $ 815,000
 If the average Turman earnings are taken for the years 1927-1929, the result is as follows:
 (a) $490,000 (average annual
 income) at 10 ........... $4,900,000
(b) 82% ........................ 4,018,000
(c) 2/3 ........................ 3,678,000
(d) Actual price paid .......... 1,450,000
 ----------
(e) Deficiency ................ $1,228,000
 The valuation reached through capitalization of earnings seems to ignore the fact that Turman, at the time of the sale, had very valuable oil properties which had not yet been brought into production and which therefore did not contribute, in the selected years, to its earnings. The value of those properties should probably be added to the capitalized earnings.
 
 
 [49]
 He found: 'Glass had an affirmative duty of encouraging bidders. * * * It appears that no intensive effect was made by the receivers to find outside bidders.'
 
 
 [50]
 And such was my own experience, in the 1920's, as lawyer for oil companies, investment bankers and other businessmen
 
 
 [51]
 Emphasis added
 
 
 [52]
 That is, MSO, UOP, Imperial Oil Corporation and Oil Lease Development Company
 
 
 [53]
 Note, once more, that this decree did not cover the sale of Eureka stock, that this decree dealt with the unpledged assets of the several companies, including UOP, that the notice of the sale of these assets did not mention Eureka or Turman, and that, accordingly, one who read the notice of sale of The Eureka stock (under the earlier decree of November 15, 1929) would not learn of the statements filed under the decree of November 22, 1929
 
 
 [54]
 Judge Lindley, in Oil Well Supply Company v. Wickwire, D.C., 52 F.Supp. 921, 922, citing many authorities
 
 
 [55]
 Byrne, Foreclosure of Railroad Mortgages, in Some Legal Phases of Corporate Finance, Reorganization and Regulation, Vol. I (1916) 77, 97
 In the same volume, p. 153 ff., Paul D. Cravath, writing of reorganization of all sorts of corporations, including industries, referred to the remarks in Byrne's article as applicable generally.
 
 
 [56]
 The valuations were received in July, 1928
 
 
 [57]
 See, e.g., Crites, Inc. v. Prudential Company, 322 U.S. 408, 418, 64 S.Ct. 1075, 88 L.Ed. 1356; Woods v. City Bank & Trust Co., 312 U.S. 262, 268, 61 S.Ct. 493, 85 L.Ed. 820; Wadsworth v. Adams, 138 U.S. 380, 388, 11 S.Ct. 303, 34 L.Ed. 984; Mechem, Agency (2d ed. 1914) Sec. 1588; Restatement of Agency, Sec. 390 and Comment f, Sec. 469 and Comment c; Warren v. Burt, 8 Cir., 58 F. 101, 103; Beatty v. Guggenheim Exploration Company, 223 N.Y. 294, 304, 119 N.E. 575; Everhart v. Searle, 71 Pa. 256; Little v. Phipps, 208 Mass. 331, 333-334, 94 N.E. 260, 34 L.R.A.N.S., 1046; Rice v. Wood, 113 Mass. 133; Lemon v. Little, 21 S.D. 628, 636-637, 114 N.W. 1001; Tracy v. Willys Corp., 6 Cir., 45 F.2d 485
 
 
 [58]
 Of the MSO serial notes-- given a substantial participation in the new company under the plan-- Judge Smith found they 'were of doubtful validity, to say the least.' The holders of those notes were but creditors of UOP's stockholder, MSO
 
 
 [59]
 See Mississippi & M. Railroad Company v. Howard, 7 Wall. 392, 19 L.Ed. 117, and the discussion of that case, as affecting the Boyd doctrine, in Frank, Some Realistic Reflections on Some Aspects of Corporate Reorganizations, 19 Va.L.Rev. (1933) 542, 544-547
 
 
 [60]
 Emphasis added
 Cf. Kansas City Southern Railway Co. v. Guardian Trust Company, 240 U.S. 166, 178, 36 S.Ct. 334, 60 L.Ed. 579.
 
 
 [61]
 Consolidated Rock Products Company v. Du Bois, 312 U.S. 510, 527-528, 61 S.Ct. 675
 See also Judge Learned Hand in Eddy v. Prudence Bonds Corporation, 2 Cir., 165 F.2d 157, 160-161.
 
 
 [62]
 Consolidated Rock Products Company v. Du Bois, 312 U.S. 510, 527-528, 61 S.Ct. 675
 
 
 [63]
 Consolidated Rock Products Company v. Du Bois, 312 U.S. 510, 61 S.Ct. 675; In re Chain Investment Company, 7 Cir., 102 F.2d 323, 324-325; Highland Towers Company v. Bondholders' Protective Committee, 6 Cir., 115 F.2d 58
 
 
 [64]
 UOP and OLD bondholders were given approximately 58,000 shares of A stock out of 300,000 issued, and no B stock. Serial noteholder received 180,000 shares of A stock, 60% of the issue. 745,000 of the 895,000 shares of B stock issued went to old stockholders, and another 107,000 shares of B stock went to serial noteholders. Together the old stockholders and serial noteholders received almost 95% of the B stock. 42 Harv.L.Rev. (1929) 899, 903 note and B stock in a voting trust, with full voting powers vested in five trustees. The trustees were to be selected by the Rorganization Committee as follows:
 
 
 [2]
 persons whom the Reorganization Committee (which included representatives of junior interests) believed to be impartial as among holders of various classes of securities;
 
 
 [1]
 persons approved by the Bondholders' Committee;
 
 
 [1]
 person approved by the Bondholders' Committee and Gulf Coast Committee;
 
 
 [1]
 person approved by the Stockholders' Committee
 During the duration of the voting trust (ten years, subject to earlier termination by action of the trustees) the Board of Directors was to be constituted as follows:
 
 
 [1]
 During the first year of the trust, the Board was to be selected by the Reorganization Committee and to consist of three persons believed by them to be impartial as among holders of various classes of securities, two persons approved by the Serial Noteholders' Committee, one the the Gulf Coast Committee and two by the Stockholders' Committee
 
 
 [2]
 During subsequent years of the trust: 3 directors chosen by the two impartial trustees, two chosen by the trustee approved by the Bondholders' Committee, 2 by the trustee approved by the Serial Noteholders' and Gulf Coast Committees and 2 by the trustee approved by the Stockholders' Committee
 
 
 [3]
 Upon the retirement of the new bonds the number of directors was to be reduced by 2 and the voting trustee approved by the Bondholders to cease to act
 After termination of the voting trust, A shareholders were, as a class, to elect 4 directors, and B shareholders, as a class, to elect 4 directors. A and B shareholders would also vote, as classes, for a ninth director, but the position was to be vacant unless the same person was voted for by holders of both a majority of A stock and a majority of B stock represented at the election.
 Neither A shareholders nor directors elected by them (nor, during the voting trust, trustees approved by Committees representing them) were to be permitted to vote on the question of redeeming A stock or in favor of voluntary dissolution or liquidation of the company.
 
 
 [65]
 Consolidated Rock Products Company v. Du Bois, 312 U.S. 510, at page 528 61 S.Ct. 675, 686
 
 
 [66]
 That the Boyd doctrine applies to a merger, even of railroad companies under Sec. 77 of the Bankruptcy Act, 11 U.S.C.A. § 205, see, e.g., R.F.C. v. Denver 205, see, e.g., R.F.C. v. Denver & Rio Grande Western R. Co., 328 U.S. 495, 66 S.Ct. 1282, 90 L.Ed. 1400
 
 
 [67]
 Had UOP been separately reorganized, there would have been no sale of its claim against UOP, which was in amount at least $1,730,000
 The separately reorganized new UOP would have been in a position to demand that, for its claim, it receive new securities under a fair plan just as such securities were alloted to so-called 'outside' creditors of MSO for their claims.
 
 
 [68]
 Judge Smith also said, of certain 'minority interests,' that whether they 'were entitled to priority over the old stockholders, or whether they were entitled only to some sort of distributive share, some provision shall have been made more effectively to protect them.'
 This comment should be applied to the UOP bonds.
 
 
 [69]
 Of course, if the fair going value of (1) Eureka plus (2) the unpledged UOP assets, exceeded the $4,450,000 (approximately) owing the UOP bondholders, it was not improper to allot, under the plan, the excess to junior interests-- provided a 'system' reorganization was essential
 
 
 [70]
 See Northern Pacific Ry. Co. v. Boyd, 228 U.S. 482 at page 508, 33 S.Ct. 554, 57 L.Ed. 931
 
 
 [71]
 Rodgers, Rights and Duties of the Committees in Bondholders' Reorganizations, 42 Harv.L.Rev. (1929) 8998 903 note 13, discussing Jameson v. Guaranty Trust Company, 7 Cir., 20 F.2d 808
 
 
 [72]
 See, e.g., Strongin v. International Acceptance Bank, Inc., 2 Cir., 70 F.2d 248, 252; New York Debtor and Creditor Law, McKinney's Consol.Laws, c. 12, Sec. 274 (being the same as Sec. 5 of the Uniform Fraudulent Conveyance Act)
 
 
 [73]
 The reference was to the receivership judge, not to Judge Smith
 
 
 [74]
 That 'constructive' knowledge is a fiction, and not to be equated with actual knowledge, see Schoedel v. State Bank of Newburg, 245 Wis. 74, 76, 13 N.W.2d 534, 152 A.L.R. 459; cf. Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865; City of New York v. New York, N.H. & H.R. Co., 344 U.S. 293, 73 S.Ct. 299, 97 L.Ed. 333; McDonald v. Mabee, 243 U.S. 90, 37 S.Ct. 343, 61 L.Ed. 608
 
 
 [75]
 See, e.g., Drinker, Legal Ethics (1953) 74, 103-106, 109
 
 
 [76]
 Meanwhile, he still engages in practice as a lawyer
 
 
 [77]
 Glass' annual salary was initially $50,000. During the depression it was reduced to $24,000 but was subsequently increased and is now about $56,000
 
 
 [78]
 Judge Smith found that Glass and a group friendly to him have 'control and management' of the new company, and 'that he has greatly profited over the years from his association' with it. He also found, 'The boards of directors of the new corporation have been friendly to Glass' management and have contained several members who, by reason of employment by the corporation or by association with Glass in his law firm, have been closely connected with him.' And he found that the voting trust, which 'ran out after ten years,' was renewed, and that Glass, from the beginning, has been a voting trustee. The voting trust no longer exists
 
 
 [79]
 Judge Smith found that Glass and his family own 8% of the voting trust certificates for Class A stock, the sole class of securities now outstanding since the bonds of the new company were retired on January 1, 1945
 Large dividends have been paid on that stock, which is now worth several millions of dollars.